TYGART VALLEY GLASS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25258. Promulgated May 2, 1951.

*Norman D. Keller, Esq.*, for the petitioner.
*Albert J. O'Connor, Esq.*, for the respondent.

946

·OPINION.

DISNEY, *Judge:* The only question for our determination is whether the amount of $241,973.34 received by petitioner on or about November 23, 1945, under a settlement agreement is taxable as ordinary income or as a long term capital gain. The petitioner alleges that the sole claim that it asserted against Hartford in 1945 was a claim based upon the fraudulent taking of its cash and assets by Hartford in 1936 (hereinafter sometimes referred to as the fraud claim), and that the amount of $241,973.34 received in the settlement with Hartford constituted a return of capital and consideration for the sale of capital assets and not, as contended by the respondent, a return of rents and royalties. The claim for the return of rents and royalties by the licensees of Hartford will hereinafter sometimes be referred to as the refund claim. In short, the petitioner argues that it had no refund claim, while the respondent urges that the fraud claim was abandoned. In the alternative, the petitioner contends that if the fraud claim was not the only claim settled, that both the fraud claim and refund claim were settled, and that the $241,973.34 should be allocated between them.

Though both parties have argued at some length as to the validity of each claim, we consider it unnecessary to decide upon such validity, as to either, for our question is not their validity, but the nature, for tax purposes. of an amount received in settlement, which rests not upon the validity but upon the nature of the matter settled. *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, 316 U. S. 56; *Raytheon Production Corp.*, 1 T. C. 952, affd., 144 F. 2d 110, certiorari denied, 323 U. S. 779. Moreover, we do not find in the record before us sufficient facts from which we could decide upon the validity of either claim. We proceed to determine the nature of the matter settled in consideration of the moneys paid and here involved.

By order of the District Court, the amount of rental and royalty payments made to the receiver by the various licensees of Hartford

was to be set aside and specially earmarked as coming from each licensee, and

* * * upon confirmation by the Supreme Court of the decree to be entered herein, such receipts so collected and set aside are to be returned, without interest, to the various licensees.

It is clear from the language of the District Court's opinion, *United States* v. *Hartford-Empire Co.*, 46 F. Supp. 541, that the payments made by the licensees of Hartford (including petitioner), after the court's order, were made with the expectation under the order that at least some of the amount would be returned. The opinion gave that right. The matter was not fully disposed of by the Supreme Court until April 2, 1945, the date of the rendering of the second Supreme Court opinion on the matter.

The first Supreme Court opinion, dated January 8, 1945, *Hartford-Empire Co.* v. *United States*, 323 U. S. 386, 411, stated that the royalties that had been paid to the receiver by Hartford's licensees may, in the absence of certain conditions, none of which apparently apply here, be paid over to Hartford. The second Supreme Court opinion, dated April 2, 1945, *Hartford-Empire Co. et al.* v. *United States*, 324 U. S. 570, 572, pointed out that the licensees ought not to be put into the position of recovering from Hartford royalties paid to the receiver. After further explanation of the situation in regard to the payment of royalties the Court said:

In view of the modifications required by the opinion of this court, such licensees must pay reasonable rental and service charges on a *quantum meruit* basis (leaving out of consideration any amount otherwise payable for the privilege of practicing the patented inventions involved) in respect of the machines used in the interim. Unless Hartford, since the entry of the decree by the District Court, has been guilty of some added violation of the anti-trust laws, licensees must elect (a) to remain licensees on such reasonable rental and royalty basis for the future as the District Court may fix, or (b) repudiate the leases and litigate their rights as against Hartford to retain any portion of the rents and royalties paid. Depending upon such election of each of the lessees, the District Court may, on the application of each, make an appropriate order for the disposition of the fund in the light of the licensees' election and the principles stated in the opinion of this Court.

The petitioner, on brief, points out that a dissent filed in the second Supreme Court opinion states that the opinion as written by the majority of the Court is not clear in regard to the disposition of the royalties paid by the licensees to the receiver. Notwithstanding the dissent, Hartford through its representatives worked with a committee representing the non-defendant licensees of Hartford, i. e., the licensees that had paid the fund into the hands of the receiver, to negotiate a program in conformity with the Court's opinion which could be recommended to the Court as a reasonable and equitable basis of relationship for the future between Hartford and its licensees.

The negotiations were not restricted to discussing the future relationship between Hartford and the licensees but also considered the question of a cash refund of a portion of the amount paid by the licensees to the receiver.

For the petitioner, its general counsel testified that the only claim asserted by the petitioner against Hartford was its fraud claim [3] and that petitioner made no claim for a return of royalties. Such testimony is not conclusive. We may not rely on it alone to decide the point, but must consider the payment of the amount here in question in the light of all the circumstances and determine the motive behind the payment. Petitioner cites *Inaja Land Co., Ltd.*, 9 T. C. 727, as "seemingly" authority for the principle that if a taxpayer asserts but one claim, although he might have several, the amount received in settlement is taxable according to the claim asserted. As we read the *Inaja* case, such an interpretation is too broad. The Court there held that the petitioner had "satisfactorily established" that the consideration paid was for the property right (the one claim) alleged by the petitioner. Our question here is whether the petitioner has so established, contrary to the Commissioner's determination that royalty refunds were received.

In this connection, petitioner, on brief, also argues that Hartford was negotiating with its own money, to which the petitioner had no legal claim whatsoever. We can not see reason in such a view. The final opinion of the Supreme Court, even if we assume that it was not altogether definite as to disposition of the impounded royalties, did not award the fund outright to Hartford nor deprive the licensees of all claims to it. Again the petitioner suggests that the licensees, including petitioner, acquired no right to a return of the royalties as such, so that in receiving the $241,973.34 it was not receiving a return of royalties. As authority, *Buck Glass Co. v. Hofferbert*, 176 F. 2d 250, is cited, but we find it of no assistance to the petitioner. The court merely pointed out that the question of the payments being made as a *matter of right* did not of itself affect the taxability of the amount of the recovery in the light of the governing principle, i. e., that amounts expended and deducted in prior years are income when recovered. In short, the moneys were recovered, whether as of right or not, and therefore were taxable, and the court held that the payments to the taxpayer constituted a return of rental and royalty payments that had been previously deducted in computing Federal income tax for prior years and that the amount so recovered was taxable as income in the year of recovery.

---

[3] Contrary to petitioner's argument, Eldred, vice-president of Hartford, did not denominate the fraud claim as petitioner's only claim.

We note at this point that the *Buck* case contradicts petitioner's further argument, in substance, that the fact that the licensees were each to receive a "sum equal to" 60 per cent of the impounded fund paid in by it, indicates that there was no return of royalties. Pointing out that the moneys were earmarked by the order of the District Court, as paid in by each individual licensee, that had the licensees not continued the royalty payments there would have been no fund for distribution, and that in its final order the District Court directed return to the taxpayer of 60 per cent of the funds held in its name (less expenses), the Court says that the agreement "did in fact provide for a return to Taxpayer of 60% of the funds held by the receiver in its name," and adds:

\* \* \* Nor is that fact altered by the language of the agreement, embodied in the judgment, to the effect that each licensee was to receive "a sum equal to" 60% of the funds earmarked as coming from it.

Since the *Buck* case grew out of the same receivership proceedings against Hartford as here involved and decided the same question except for the "outside claim" it is clear that the above language therefrom negatives petitioner's view that there was no return to petitioner of its own funds, because of the expression in the agreement. The same conclusion applies to the petitioner's argument, in substance, that the use of the expression "which for purposes of such computation only" preceding "is designated as an amount equal to sixty percent (60%) of the balance" indicates that the money received was not refund of royalties. These conclusions, however, do not settle the question as to whether, in fact, the recovery by compromise was of refund, or, on the other hand, for fraud.

The petitioner, in fact, received the same percentage as the large number of other licensees receiving 60 per cent of royalties paid to the receiver—and obviously the fact is significant. The fact that the percentage received was common to all indicates settlement of a claim common to all so receiving it. But the licensees did not all possess a common claim as to anything except royalties, for some, such as petitioner and Knox Glass Company, had "outside claims," amounting in petitioner's case to about $1,000,000. The amount of other "outside claims" does not appear. Thus, it appears that the only common claim was for return of royalties, and that in compromise thereof a percentage, common to all participating, was received. Moreover, petitioner's directors' minutes of October 1, 1945, indicate recognition by petitioner at that time that Hartford took the view that "there were no funds available to settle with us for the 1936 transaction"; yet the same minutes show authority to conclude an agreement. Obviously, therefore, there was some thought of settlement on some basis not involving the 1936 fraud transaction. Likewise, the minutes of November 5, 1945, show recognition that the court re-

quired the licensees "to surrender any right or claim for refund" and show authority given petitioner's officers to surrender all claims for refund of royalties paid the receiver as well as to execute the general release for the consideration mentioned. Thus, it appears that there was intentional surrender by petitioner of claims for refund of royalties (even if along with general release) contrary to petitioner's primary contention now that there was no such claim, or release of such claim.

It is true, of course, that the minutes of November 5, 1945, recite the opinion of counsel that the fund was no longer earmarked as coming from royalties, and mention the net settlement fund; but the fact remains that the minutes of October 1, 1945, disclose intent further to consider the matter.

In this connection we find significance in the fact that though on September 4, 1945, the committee was told that petitioner would not "go along" and that the minutes of October 1, 1945, show a report that the Industry meeting had been told by petitioner's representative on September 18 that petitioner would not "go along" with any settlement requiring release without consideration for the 1936 matter, nevertheless negotiations for an agreement were ordered continued, and, after the Industry meeting, convinced that it would have to "go along with the industry," petitioner "chose to go along"; and petitioner did "finally join in the industry settlement." Except for the minutes, the quotations are from the testimony of petitioner's general counsel. In other words, there was reversal of the previous position. Hartford had taken the view that it did not agree with petitioner's position asking restitution for the patents and feeders and money paid, in the amount of about $1,000,000, and had urged petitioner to accept the same formula of settlement as the balance of the industry. Petitioner's decision to "go along" appears reasonably as not only a joinder in the same position as the other licensees accepting settlement, but an abandonment of the previous claim for restitution for the 1936 matter. The crux of the previous difference between Hartford and petitioner was whether basis of settlement should be the restitution of cash, patents and feeders because of fraud, or the participation with the industry, in the royalty refund. Petitioner decided to go along—which means to us go along with the other licensees in common acceptance of a percentage of the refund of royalties. The petitioner's previous contention then became immaterial. What was desired was a settlement, and it was effected, not on the basis of petitioner's earlier contention, but the alternative, urged by Hartford and the committee, and finally accepted. The nature of the settlement was not the same as the prior contention of the petitioner, for it was to "go along," that is, it acceded to a

different basis of settlement. In our view, neither mention of the previous demand, in the minutes of October 1, 1945, nor the opinion of petitioner's counsel, set forth in those of November 5, 1945, when the matter was being closed, in effect that the amount received would cover the 1936 claim, is sufficient to overcome the realities of the situation, that the former view had been abandoned. Had it not been so, there apparently would have been no settlement. Nothing before us is convincing that petitioner merely received $241,973.34 on its claim for about $1,000,000. It in fact participated with and received the same percentage as those licensees who had nothing but claim for refund. Petitioner, if it had had no "outside" claim, would have received $241,973.34, as it did.

The petitioner in urging that it settled with Hartford a claim for feeders, patents, and cash, had the burden of so showing. Petitioner's witness Eldred was vice president in charge of operations of Hartford. He was not asked and did not state what claim was settled, but stated only the position taken by Tygart at the meeting in September 1945, to the effect that Tygart took the position that it could not entertain settlement under the terms offered, that Tygart felt it had a special situation and wanted restitution for patents, feeders, and damages paid to Hartford, but that Hartford did not agree with such position and urged acceptance of the formula accepted by the industry. With Hartford's representative on the witness stand it would appear that petitioner could, had he been willing to support petitioner's view, have elicited from him whether the feeder-patent-cash claim was settled. Such evidence would tend to support the petitioner, and failure so to inquire is noticeable. It may well be that Hartford had reason to wish to settle the royalty claim instead of the 1936-fraud allegedly capital transaction—for instance, because of possibility of deduction or exclusion by it of royalty payments involved in the refund, an element not applicable to settlement of a capital transaction. It would appear that Hartford would otherwise not have been averse to a settlement of the fraud claim, for the same amount of money payable under the refund claim, and that the settlement could definitely, in such case, have so stated. It does not do so. Any such self-interest against settlement of the 1936-fraud claim, on the part of Hartford, would tend to explain its refusal to settle that claim with petitioner; and the record shows a change of mind not on the part of Hartford, but on the part of petitioner—a change away from its proposal of settlement of the allegedly capital matter. That Hartford was not without tax consciousness at the time of the settlement in 1945 is indicated by the reference to payment of taxes, in Hartford's proposition, and in the letter from the committee to the non-defendant licensees both of which refer to the payment of taxes.

Again, though petitioner contends that the payment of the amount here in question was in settlement of its fraud claim, petitioner's own witness testified that the "outside claims" were never discussed "as such" between the committee and Hartford's representatives. Since Hartford, as above seen, urged petitioner to accept the same formula for settlement that the balance of the industry had accepted it would appear from this testimony that the refund claim of petitioner was, when the industry formula was accepted by petitioner, at least the primary matter settled.

As explanation of why the industry formula of settlement was accepted by petitioner, it is argued that all non-defendant licensees were in effect required to do so. One of petitioner's witnesses testified that the judge of the District Court advised the industry that unless there was a 100 per cent acceptance of the industry settlement formula the entire settlement would fall through.[4] But the fact is that 16 non-defendant licensees did not join the others in the settlement, which proves that a 100 per cent acceptance of the industry settlement formula was not required. One of the 16 was Hazel-Atlas Glass Co. which apparently had a situation considerably analogous to that of petitioner, for it was because of the judgments against it, and Shawkee Manufacturing Company, in Hartford's favor, that counsel for petitioner advised the settlement in 1936. Thus, it appears that petitioner has not shown that its joinder in the settlement in 1945 was involuntary.

After careful study of all of the various arguments made, and the extensive facts involved, though we have not considered all necessary of discussion, we are not convinced that there is showing that the fraud claim was the basis of the settlement made, but, in our view, that claim was abandoned, and settlement made on the basis of the royalty refund. In our view, there is illogic in a contention that a settlement was negotiated with a committee representing a group of licensees on the basis of giving the individual members of the entire group the same percentage of the amount of rents and royalties they had previously paid in to the earmarked fund, but that as to one of the group (petitioner) the settlement was made on the basis of an "outside claim" (the fraud claim) which was never discussed "as such" between Hartford and the committee. The realistic approach appears to us to be that the settlement was made on the basis of the refund claim which in reality determined the amount that each licensee should receive. We hold, therefore, that the real basis of the settlement was the refund claim and that the amount received constituted a return of

[4] The witness also stated: "However, later on there were a few companies who had minor claims which were dropped out of the settlement." No further explanation is given why 100 per cent acceptance was required, yet a few companies were dropped out.

rental and royalty payments that had been previously deducted in computing Federal income taxes for prior years, and that the amount here in question was ordinary income, not capital gain, for the fiscal year ending September 30, 1946.

This conclusion makes it unnecessary to consider petitioner's theory of allocation or valuation of the fraud claim.

*Decision will be entered for the respondent.*