VICTOR E. GIDWITZ FAMILY TRUST, MERCANTILE BANK AND TRUST CO., TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MICHAEL GIDWITZ II TRUST, MERCANTILE BANK AND TRUST CO., TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4278–70, 4279–70.   Filed February 21, 1974.

*Thomas R. Mulroy, Ralph E. Davis, William P. Sutter,* and *Samuel H. Horne,* for the petitioners.

*Seymour I. Sherman,* for the respondent.

GOFFE, *Judge:* Respondent determined deficiencies in the Federal income taxes for the taxable year 1966 against the petitioner in docket

No. 4278-70 in the amount of $25,760.86, and against petitioner in docket No. 4279-70 in the amount of $24,283.80. The two issues presented for decision are:

(1) Whether amounts received by petitioners in settlement of a lawsuit constitute gain from the sale or exchange of a capital asset; and

(2) Whether all of the amounts received by the petitioners for redemption of preferred stock were in exchange for such stock and taxable as a capital gain under section 302(a) of the Internal Revenue Code of 1954 [1] or whether a portion thereof is taxable as a dividend under section 301.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein.

Petitioner Mercantile Bank & Trust Co. (Mercantile) is trustee of the Victor E. Gidwitz Family Trust and the Michael Gidwitz II Trust, two inter vivos trusts. Petitioners have offices and principal places of business in Boulder, Colo., and the fiduciary income tax return of each trust for the taxable year 1966 was filed with the district director of internal revenue at Denver, Colo. During all times material here, the investment committee of each trust consisted solely of Victor E. Gidwitz. The trust instruments of both trusts provided in part that the trustee was to make purchases, pledges, or sales of trust property only upon the direction of the investment committee. The trustee was prohibited from participating in or consenting to any reorganization, consolidation, merger, or change in the financial structure of any corporation or other organization whose securities constituted a portion of the trust property except upon the written direction of the investment committee.

Each trust owned 250 shares of common stock of Material Service Corp. (Material Service), an Illinois corporation.

There were outstanding 76,543 shares of common stock of Material Service, of which 74,323 shares (or 97 percent) were owned by Henry Crown and his family. Henry Crown was chairman of the board of directors of Material Service.

Material Service, on November 27, 1959, mailed notices to its shareholders for a special meeting of shareholders to be held on December 29, 1959, to consider a merger of Material Service into General Dynamics Corp. (General Dynamics).

General Dynamics did not wish to acquire certain assets of Material Service pursuant to the merger; therefore, the plan of merger provided that such assets (hereinafter referred to as excluded assets) were to be distributed in redemption of some shares of Material Serv-

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

ice held by Empire Properties. Empire Properties was an Illinois partnership composed primarily of Robert Crown and John J. Crown, sons of Henry Crown.

The value assigned to the excluded assets for purposes of the redemption was $31,740,388. Material Service was to redeem 19,011 shares of its stock (or 24.8 percent of the total outstanding shares of Material Service) owned by Empire Properties in exchange for the excluded assets.

After receiving such notice, Gidwitz and a trust officer of the then trustee of the trusts went to the offices of Material Service and examined the various appraisal reports and property descriptions relating to the excluded assets. They concluded that the excluded assets were undervalued by at least $20 million. As owners of approximately three-quarters of 1 percent of the outstanding stock of Material Service, the Gidwitz trusts' share of an upward valuation of the excluded assets to the extent of $20 million was $130,645. Gidwitz consulted his attorney, Thomas Mulroy, on December 22, 1959, and asked him to represent the trusts and to demand that the trusts participate in the distribution of the excluded assets, and, if such participation were opposed by the Crowns, that steps be taken to block the merger. Gidwitz called Henry Crown from Mulroy's office and arranged a conference for the following day in Henry Crown's office.

The conference on December 23, 1959, was attended by Gidwitz, Mulroy, Henry Crown, and his attorney, Albert E. Jenner, Jr. Gidwitz explained his belief that the excluded assets were undervalued and that the Gidwitz trusts should be permitted to participate in the redemption in the same manner as Empire Properties so that the trusts would own an interest in the real estate which comprised the excluded assets.

Henry Crown said that such an arrangement was not possible but that he would recommend to his sons who controlled Empire Properties that 60-day options be granted to the Gidwitz trusts to purchase two of the excluded assets at prices equal to the values assigned to them for purposes of the redemption. The properties which Henry Crown indicated might be the subject of the options were an 18-acre tract with a residence thereon in Beverly Hills, Calif., and a tract of land near Tucson, Ariz. At the conclusion of the meeting, Gidwitz agreed to consider the options.

The following day, December 24, 1959, Gidwitz called Mulroy by telephone and insisted that Mulroy take more aggressive action against the Crowns instead of accepting the options, including filing a suit to enjoin the redemption and merger which were subject to approval by the shareholders on December 29. Mulroy explained to Gidwitz that

such an action would require posting a bond of $50 million and, because Mulroy would have a conflict of interest in such litigation because of another client, Gidwitz must employ another attorney to represent him. Because of the requirement of the bond, the proximity of the shareholders meeting, and the necessity to secure other counsel, Gidwitz asked Mulroy if he could continue to represent the Gidwitz trusts if they accepted the options and did not attempt to block the redemption and merger. This Mulroy agreed to do; therefore, Gidwitz authorized Mulroy to accept the options on behalf of the Gidwitz trusts.

On December 28, 1959, Mulroy met with Jenner in Jenner's office, together with law partners from each law firm. Mulroy restated Gidwitz' objections to the merger and advised Jenner that because of a conflict of interest he could not represent Gidwitz in litigation against the Crowns but if a satifactory arrangement were not made, Gidwitz would probably vote against the redemption and merger at the shareholders meeting the following day and would file a legal action to enjoin the redemption and merger. At that point, Jenner excused himself from the room to accept a telephone call from Henry Crown. Crown told Jenner that his sons approved Empire Properties giving the options and to offer them to Gidwitz. Jenner reluctantly agreed to do so. He returned to the meeting and offered the options to Mulroy, which Mulroy accepted on behalf of the Gidwitz trusts. In offering the options to Mulroy, Jenner emphasized that Gidwitz was free to vote in any manner he chose at the shareholders meeting and to commence any legal action he wished. Mulroy and Gidwitz were reluctant to accept an oral promise for the options but they did so because the shareholders meeting was scheduled for the following day, and they had confidence that the Crowns and Jenner would honor their oral promises.

Later the same afternoon, Jenner called Mulroy at his office to confirm that the options would be forthcoming and also to advise Mulroy of the names of the individuals to contact at Material Service to obtain the precise names, record titleholders, and legal descriptions of the properties to be covered by the options. Mulroy's office began drafting the options that afternoon.

That evening, December 28, 1959, Jenner called Mulroy by telephone at his home to explain that Henry Crown had expressed concern to him that afternoon that it would be embarrassing if Gidwitz were to vote against the redemption and merger at the shareholders meeting the following day. Mulroy assured Jenner that because of the options, Gidwitz would not vote against the redemption and the merger.

The shareholders of Material Service and General Dynamics approved the redemption and merger at the meetings of the shareholders of both corporations on December 29, 1959. Gidwitz did not attend the Material Service meeting. Gidwitz took no action to block the merger or to assert the rights of the Gidwitz trusts as dissenting shareholders.

The excluded assets were transferred by Material Service to Empire Properties at or prior to the effective date of the merger, December 31, 1959. The merger was consummated as planned and the shareholders of Material Service (including petitioners herein) exchanged their shares of Material Service common stock for shares of General Dynamics convertible preference stock.

In early January, Jenner's office forwarded to Mulroy a draft of an option for the Tucson property.

On January 5, 1960, a meeting was held in the offices of Material Service attended by Gidwitz, Mulroy, Jenner, Henry Crown, and his sons, Robert Crown and John J. Crown, and others. Robert Crown explained that Henry Crown, in extending to Gidwitz an option on the Beverly Hills property, had overlooked an outstanding commitment to a General Zyler to acquire that property which commitment would expire on October 1, 1960. The Crowns offered to grant the Beverly Hills option to the Gidwitz trusts on October 1, 1960, and Gidwitz, though disappointed, agreed to such a change from the original promise. The Crowns agreed to deliver the option on the Tucson property at once, but Gidwitz said he preferred to receive both options simultaneously.

During the period from January 1960 through September 1962, Mulroy and his law partners prepared proposed option agreements which were forwarded to Jenner but were never executed. Mulroy and his law partner, Ralph Davis, made numerous but unsuccessful attempts by telephone, telegram, and letter to contact Jenner in order to secure the executed options. Jenner never denied that an oral agreement to deliver signed option agreements had been made, and on March 1, 1961, wrote to Mulroy informing him that the prepared options would be delivered to Mulroy within a few days.

Mulroy, in frustration and because of his conflict of interest as to litigation, withdrew as counsel for the Gidwitz trusts and another attorney was employed by Gidwitz in November 1962 to sue Henry Crown and Jenner. The suit was filed by Gidwitz because he believed that the Gidwitz trusts had not received enough as a result of the merger and that the options, which were not delivered, were to make up the difference between the value of the stock the trusts received in the mergr and what they should have received. A complaint was filed by Mercantile Bank & Trust Co., as trustee for the Gidwitz trusts,

in the United States District Court for the Northern District of Illinois against Henry Crown and Jenner in 1964. In the complaint, the trustee alleged that Crown "agreed to grant or cause to be granted the Gidwitz Trust interest and deliver promptly after the effective date of the proposed agreement and plan of merger" written 60-day options to purchase the Tucson and Beverly Hills properties in consideration for which the Gidwitz trusts agreed to refrain from:

(a) Voting against, or in any other way opposing the proposed agreement and plan of merger between Material Service Corporation and General Dynamics Corporation, and the proposed distribution of excluded assets-pursuant thereto, at the forthcoming meeting of shareholders at which the same was to be submitted to a vote;

(b) Instituting any action or other legal proceeding to enjoin the proposed merger of Material Service Corporation and General Dynamics Corporation and the proposed distribution of excluded assets pursuant thereto on the grounds hereinbefore stated or on any other grounds; and

(c) Filing with Material Service Corporation any written objection to the proposed agreement and plan of merger, and the proposed distribution of assets pursuant thereto.

In a separate count, the trustee alleged that Jenner expressly and impliedly warranted himself to be duly authorized to fix the terms of, and enter into, an agreement on behalf of Henry Crown for delivery to the Gidwitz trusts of options to purchase the Beverly Hills and Tucson properties in consideration of its objections to the proposed agreement and plan of merger and distribution of excluded assets, and that in reliance upon such warranties, Mulroy entered into an oral agreement with Jenner in that respect. The count contained allegations that Henry Crown failed and refused to perform the agreement because Jenner had no authority from Henry Crown to agree upon the terms of the options. Based upon the performance of the conditions of the oral agreement by the trustee and the failure of Henry Crown and Jenner to execute the options, the trustee sought damages of $975,000 against each of the defendants. Both Henry Crown and Jenner filed answers to the complaint in which they denied all of the allegations.

The parties settled the suit by payment to the plaintiffs of $225,000. This amount was divided equally between the two Gidwitz trusts, petitioners herein. In the 1966 fiduciary income tax returns filed for petitioners, the amount received in settlement of the suit, less certain expenses, was reported as proceeds received from the sale or exchange of a capital asset. In the statutory notice of deficiency, respondent determined that the net proceeds of settlement constituted ordinary income taxable under section 61 of the Internal Revenue Code.

Petitioners continued to hold some of the General Dynamics convertible preference shares they had received as a result of the merger of Material Service and General Dynamics until April 15, 1966, when

such shares were redeemed by General Dynamics. The trusts received in redemption a total amount of $62.7491 per share, which consisted of the following:

| | |
|---|---|
| Optional redemption price_____ | $61.9031000 |
| Accrued dividend for period 1/1/66 to 3/31/66_____ | 0.7265625 |
| Accrued dividend for period 4/1/66 to 4/16/66_____ | 0.1194375 |
| Total _____ | 62.7491000 |

The number of General Dynamics convertible preference shares held by each petitioner immediately prior to April 15, 1966, the total amounts received by each petitioner in redemption of its shares, and that portion of the amount received which represented accrued dividends for the period of January 1, 1966, to March 31, 1966, were as follows:

| | Docket No. 4278-70 | Docket No. 4279-70 |
|---|---|---|
| Number of shares_____ | 4037.02 | 2245.02 |
| Total received_____ | $253,465.98 | $140,726.84 |
| Accrued dividend for period Jan. 1, 1966, to Mar. 31, 1966_____ | $2,933.15 | $1,631.15 |

The agreement and plan of merger, which became part of the certificate of incorporation of General Dynamics under Delaware law on the date of the merger with Material Service, provided for rights of the convertible preference shareholders as follows:

The holders of the Preference Stock shall be entitled to receive dividends, commencing April 1, 1964, but not before, when and as declared by the Board of Directors from the surplus or net profits of the Surviving Corporation [GD] available for the payment thereof, at the rate of $2.90625 per share per annum, and no more.

Dividends on the Preference Stock shall be payable quarterly, commencing on April 1, 1964, on the first days of January, April, July and October in each year * * *. The dividends on the Preference Stock shall be cumulative from and after January 1, 1964 and shall be deemed to accumulate from day to day thereafter, and shall be paid or set apart for payment before any dividend on the Common Stock shall be paid or set apart; so that, if in any dividend period, dividends at the above rate shall not have been paid thereon, the deficiency shall be paid or set apart for payment before any dividends shall be paid upon or set apart for the Common Stock.

After full cumulative dividends on all shares of Preference Stock outstanding shall have been declared and paid, or set apart for payment, for all previous dividend periods and for the current dividend period, * * * then and not otherwise, * * * subject to the provisions of the next paragraph hereof, dividends may be declared and paid, or set apart for payment, on the Common Stock, payable then or thereafter, out of any remaining surplus or net profits available for the payment of dividends.

So long as any of the Preference Stock shall be outstanding, the Surviving Corporation shall not (i) declare or pay any dividend (whether in cash, stock of any other corporation or otherwise) or make any distribution on the Common Stock * * *, or (ii) directly or indirectly, either in its own capacity or through

any subsidiary or otherwise, purchase, redeem or otherwise acquire for value * * * any shares of Common Stock * * *, if:

(1) the Surviving Corporation shall not have declared and paid, or set apart for payment, full cumulative dividends on all outstanding shares of Preference Stock for all previous dividend periods and for the current dividend period ; * * *

If any of the dividends on convertible preference stock were not claimed within 6 years of their payment date, they were to become corporate property.

The agreement provided a procedure by which the holders of the convertible preference stock, subject to certain variations not relevant here, could convert their stock into common stock at the ratio of 1 share of convertible preference stock for 1.056818 shares of common stock. No adjustments were to be made in the ratio on account of dividends, and in the event the convertible preference stock were called for redemption, all such stock was immediately convertible into common stock until the close of business on the 15th day prior to the date fixed for such redemption. The convertible preference stock was redeemable at the option of the General Dynamics board of directors at any time on or after January 2, 1964, in whole or in part, at a price equal to the sum of an amount designated as the current optional redemption price plus an amount equal to unpaid dividends accrued to the date fixed for redemption. The current optional redemption price for 1966 was $61.9031 per convertible preference share.

General Dynamics had no power to adversely affect the preferences, rights, or powers of the convertible preference stock without the affirmative vote of the owners of two-thirds of the then-outstanding convertible preference stock.

The General Dynamics board of directors declared quarterly dividends on both the convertible preference stock and common stock of the corporation at meetings held in January, April, August, and October 1965. At a meeting of the board of directors held on January 28, 1966, it was proposed that a quarterly dividend be declared on the common stock of the corporation. As it was possible that the convertible preference stock would not be outstanding on March 31, 1966 (the payment date of the convertible preference dividend), the minutes reflect the following resolutions:

RESOLVED, that funds to pay on April 1, 1966 a quarterly dividend of $0.7265625 a share on the Convertible Preference Stock of the Corporation be, and hereby are, authorized and directed to be set apart on the books of the Corporation; and further

RESOLVED, that a quarterly dividend of $0.25 per share be, and hereby is, declared on the Common Stock of the Corporation, payable on March 10, 1966 to stockholders of record at the close of business on February 10, 1966.

On March 14, 1966, the board of directors of General Dynamics met to consider redemption of the convertible preference stock. The resolu-

tions of the board provided that the redemption price was to be $62.7491 per share, representing the current optional redemption price of $61.9031 per share plus an amount equal to full cumulative dividends from January 1, 1966, to and including April 15, 1966.

On their Federal income tax returns for the taxable year 1966, petitioners reported the following amounts as long-term capital gains resulting from sale or exchange of General Dynamics convertible preference shares:

| | |
|---|---|
| Docket No. 4278–70 | $253, 465. 98 |
| Docket No. 4279–70 | 140, 726. 84 |

Respondent, in his statutory notices of deficiency, determined that of the amounts received, the portions representing accrued dividends for the period from January 1, 1966, to March 31, 1966, were taxable as ordinary income rather than capital gains.

### OPINION

The first issue is whether the $225,000 received by petitioners in settlement of a lawsuit for damages for failure to deliver options constitutes capital gain or ordinary income.

Petitioners filed suit against Henry Crown and his attorney for damages resulting from their failure to deliver options for petitioners to acquire real estate in Beverly Hills, Calif., and Tucson, Ariz. The options were the subject of an oral agreement between petitioners and Henry Crown arising out of a plan of merger of Material Service, controlled by Crown, and General Dynamics, the successor corporation. Petitioners were minority shareholders in Material Service and they objected to the portion of the plan of merger which provided for the redemption of Material Service stock held by certain of the Crown interests by the transfer to such interests of real estate having a value of some $30 million. Petitioners contended that the real estate was worth some $20 million more than the value assigned to it for purposes of the redemption and they demanded to share in the redemption. They threatened court action to block the merger unless their demands were met. Henry Crown and his interests orally offered options to the petitioners to acquire real estate in Tucson and Beverly Hills, but neither he nor his attorney would deliver the options. Therefore, the litigation was commenced which resulted in settlement, the payment of which creates the issue herein.

The issue is one of fact and law. The parties here disagree on the quid pro quo for the options. Petitioners contend that the options, if executed, represented consideration for their stock in Material Service in addition to the General Dynamics stock they received in the merger. Respondent contends that the options were the subject of a side

agreement in the nature of compensation for petitioners refraining from blocking the merger.

We have carefully examined the testimony of Gidwitz, Mulroy, Crown, and Jenner and have set forth above in the Findings of Fact in detail the events which led to the promise of Crown through Jenner to grant the options to Gidwitz for the benefit of petitioners. Crown's testimony was at times ambiguous and in many instances he deferred to Jenner for details. Jenner's memory was extremely poor except to re-iterate that the options had nothing to do with the merger. On the other hand, we found the testimony of Gidwitz and Mulroy to be de-tailed and persuasive. We conclude on the basis of the record that the options were promised by Crown as additional consideration for the Material Service stock owned by petitioners. This is the only interpre-tation of the events that makes much sense. Gidwitz and Crown were frantically attempting to settle their differences before the share-holders meeting which was called to vote on the merger. Gidwitz de-manded more from the merger and Crown offered the options. We do not see how Crown can, in all candor, contend the options were prom-ised for other reasons.

Respondent seeks to tax the settlement as ordinary income as com-pensation because the trusts agreed not to vote against the merger. Al-though a trust may engage in a trade or business, we have serious doubts whether a trust, which is an inanimate object, can perform or agree not to perform personal services for compensation. It is not necessary for us to decide such an abstract question, however, because we have found as a fact that the quid pro quo for the oral agreement to deliver the options was additional consideration for the Material Serv-ice stock owned by petitioners. Having found such to be the fact, we must follow it through the litigation to the proceeds to determine the taxability of the settlement.

The taxability of the settlement is controlled by the nature of the litigation. *Raytheon Production Corp.* v. *Commissioner*, 144 F. 2d 110, 114 (C.A. 1, 1944), affirming 1 T.C. 952 (1943), certiorari denied 323 U.S. 779 (1944); *Margery K. Megargel*, 3 T.C. 238 (1944); *Sarah A. Young*, 16 T.C. 1424 (1951); *I. C. Bradbury*, 23 B.T.A. 1352 (1931), affirmed sub nom. *Commissioner* v. *Timmer*, 78 F. 2d 599 (C.A. 6, 1935).

The nature of the litigation is, in turn, controlled by the origin and character of the claim which gave rise to the litigation. *United States* v. *Gilmore*, 372 U.S. 39 (1963); *Woodward* v. *Commissioner*, 397 U.S. 572 (1970); *United States* v. *Hilton Hotels*, 397 U.S. 580 (1970).

Having found that the claim arose out of the purported inadequacy of the consideration received in the merger, it follows that the litiga-

tion and, therefore, the settlement arose from such origin and the settlement represented additional consideration for petitioners' disposition of its shares in Material Service.

We recognize that the suit against Crown and Jenner sought recovery of damages; nevertheless, this does not preclude petitioners from proving the true and exact nature of the claim. *Tygart Valley Glass Co.*, 16 T.C. 941, 951 (1951).

We find the facts here analogous to those in *David A. DeLong*, 43 B.T.A. 1185 (1941), where the majority shareholder sought the approval of the taxpayer, a minority shareholder, to a merger being negotiated by the majority shareholder. The majority shareholder paid the taxpayer $14,000 to secure his cooperation and the taxpayer would not have approved the merger except for the receipt of such consideration. We held there that the taxpayer had disposed of his stock for the stock in the successor corporation and the $14,000 in cash, recognizing that the total consideration he received came from two sources, the merger transaction and the majority shareholder. As we stated at page 1187 of that opinion, "There is no requirement of which we have been made aware that the sales price of an article can not be paid in whole or in part by one other than the vendee." The Commissioner acquiesced in that conclusion, at 1941-1 C.B. 3, and has not seen fit to withdraw that acquiescence.

We hold, therefore, that the amounts received by the trusts in settlement of the lawsuit against Crown and Jenner constitute long-term capital gains.

The other issue is whether the portions received by the petitioners in redemption of their General Dynamics convertible preference stock, representing an accrued dividend, constitute an amount received in redemption or dividend income. Other shareholders of General Dynamics presented the identical issue to us in *Arie S. Crown*, 58 T.C. 825 (1972), affd. 487 F. 2d 1404 (C.A. 7, 1973), and we held such amounts to be dividend income. We follow our opinion in that case and hold that $2,933.15 received by petitioner in docket No. 4278-70 and $1,631.15 received by petitioner in docket No. 4279-70 of their total receipts for redemption of General Dynamics convertible preference stock constitute dividend income.

*Decisions will be entered under Rule 155.*