Jean Ronald GETTY; Karin Getty,
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

No. 89–70108.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1990.

Decided Sept. 14, 1990.

Philip S. Magaram and Mark S. Levin, Valensi, Rose & Magaram, Los Angeles, Cal., for petitioners-appellants.

Bruce R. Ellisen, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WALLACE, THOMPSON and O'SCANNLAIN, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

J. Ronald Getty ("Ronald") and Karin Getty appeal the tax court's decision in *Getty v. Commissioner*, 91 T.C. 160 (1988), that $10 million which Ronald received from the settlement of a suit against the trustees of the J. Paul Getty Museum ("the Museum") is taxable as income.[1] We have jurisdiction under 26 U.S.C. § 7482(a), and we reverse.

## FACTS

Ronald is the son of the late J. Paul Getty ("J. Paul") and his third wife, Adolfine Getty ("Fini"). J. Paul and Fini were married in 1928. Fini returned to her native Germany soon thereafter as a result of her mother's death. Ronald was born in Germany in 1929.

J. Paul and Fini divorced in 1932. In 1934, Fini sought an improvement in her prenuptial agreement with J. Paul and attacked the validity of the divorce. By 1934, J. Paul had remarried and had two more sons by his new wife.[2] In a letter to Fini's father, Otto Helme, dated November 20, 1934, J. Paul threatened that if Fini brought him "worry, anxiety, and trouble," he would not be disposed to leave Ronald a large sum of money. Less than one month prior to that letter, J. Paul had executed a codicil to his will, reducing Ronald's bequest to $5,000. Prior to the execution of

---

1. We will refer to Ronald as the taxpayer because he filed the suit against the trustees of the Museum and the other defendants, individually and as guardian ad litem for his children. This suit led to the $10 million settlement payment. Ronald's wife Karin is also a party to this appeal because she joined her husband in filing an income tax return for the tax year 1980.

2. J. Paul had five sons in all: Ronald; George Franklin Getty II (George, Jr.), who died in 1973 without surviving issue; Eugene Paul Getty (Paul, Jr.); Gordon Peter Getty (Gordon); and Timothy Ware Getty, who died in 1958 without surviving issue.

this codicil, Ronald would have been treated equally under the will with J. Paul's other children.

On Christmas Day 1934, J. Paul and his mother, Sarah, entered into an oral agreement for the joint establishment of an irrevocable *inter vivos* spendthrift trust ("the 1934 trust") to which each, as a trustor, would contribute assets. J. Paul agreed to contribute about $1 million of his stock in George F. Getty, Inc. (the predecessor corporation to Getty Oil Company ("Getty Oil")). Sarah agreed to contribute $2.5 million in promissory notes.

The 1934 trust provided that the income from the trust would be paid to J. Paul during his lifetime and then to his children or their descendants in certain proportions. J. Paul, the trustee, could waive income in whole or in part.[3] The waived income, and all income after J. Paul's death, was to be allocated and paid annually as follows: $9,000 each to Paul, Jr. and Gordon (or their respective issue); $3,000 to Ronald (or his issue); and the remainder equally to Paul, Jr., Gordon, George, Jr., and any afterborn children of J. Paul (or their respective issue). Thus, Ronald's half-brothers (or their issue) would share equally in annual income distributions after distribution of the first $21,000. Ronald's income interest was limited to $3,000 per year. The trust was to terminate upon the death of J. Paul's last surviving son. The corpus of the trust would then be divided among all of J. Paul's grandchildren, *per stirpes*, with the same share to Ronald's children as to the children of the other sons.

In 1940, it was discovered that the 1934 trust did not contain language declaring it to be irrevocable. If the 1934 trust was revocable, Sarah's contribution to the trust might have been included in her estate for federal estate tax purposes. Sarah wrote a letter (drafted by her attorneys) to J. Paul indicating that it had been her intention at the time of the creation of the 1934 trust that the trust be irrevocable. The letter

further stated that if the trust was revocable, Sarah wanted to revoke the trust and dispose of her share "in a manner which is more pleasing to me at present than now provided by the Declaration of Trust."

On May 20, 1940, J. Paul brought an action (*Getty I*) against Sarah and his sons to declare the 1934 trust irrevocable. Ronald, then eleven years old, was represented in *Getty I* by Fini as his guardian ad litem. Fini learned for the first time in *Getty I* about the 1934 trust and the inequality of Ronald's treatment thereunder (sometimes hereafter referred to as "the inequality"). Fini refused to sign and deliver pleadings in *Getty I* that J. Paul asked her to sign until she obtained J. Paul's assurance that he would see to it that the inequality was eliminated. *Getty I* was "friendly" litigation which was decided eleven days after the complaint was filed. As a result of the lawsuit, the 1934 trust was declared irrevocable on May 31, 1940.

Soon after the 1934 trust was declared irrevocable, J. Paul's attorneys drafted a new will for Sarah. Correspondence between David Hecht (attorney for J. Paul and Getty Oil), David Staples (in-house counsel for Getty Oil), and Thomas Dockweiler (attorney for J. Paul and Sarah) in June, July, and August 1940 ("the Hecht letters") dealt with Sarah's will and the inequality.

On August 7, 1940, Sarah executed a new will. In this will, Sarah provided testamentary trusts of $50,000 each for Paul, Jr. and Gordon, and $200,000 for Ronald. The residue of Sarah's estate was to be held in trust with income for life to J. Paul, and thereafter with income to go equally to J. Paul's sons, including Ronald. The disparity in the size of the trusts for J. Paul's sons under Sarah's will was to remedy the inequality that would exist as to Ronald until J. Paul's death. Sarah's will did not purport to deal with the inequality which would exist under the 1934 trust after J. Paul died. Sarah died on December 26,

---

**3.** On December 31, 1934, J. Paul executed a document waiving his right to income from the shares of stock he had contributed to the trust. The effect of this waiver was that approximately

20% of the income from the trust was paid to income beneficiaries other than J. Paul during his lifetime.

1941, leaving an estate valued at approximately $1.7 million.

Ronald learned about the inequality for the first time from Fini in 1948, when he was eighteen years old. When Ronald spoke to J. Paul about the inequality, J. Paul assured him that he intended to eliminate it. J. Paul gave Ronald similar assurances periodically thereafter.

J. Paul died on June 5, 1976, leaving an estate valued at about $760 million. Ronald was named one of the three co-executors of J. Paul's will and collected an executor's fee of about $4,350,000. The other co-executors were Gordon and Title Insurance and Trust Company. In his will, J. Paul left Ronald 2,000 shares of Getty Oil stock valued at the date of his death at about $330,000, some personal effects, and a life interest in a home in Italy. J. Paul's other sons received only nominal bequests. No other son received shares of Getty Oil stock.

After certain minor individual bequests, J. Paul's will left the residue of his estate to the trustees of the Museum to become part of the Museum's endowment fund. The residue of the estate consisted of approximately 20% of the outstanding shares of Getty Oil stock. The Museum received in excess of $1.2 billion from the estate valued at the dates of distribution.

At the time of J. Paul's death, the 1934 trust held approximately 32 million shares of Getty Oil valued at approximately $1.3 billion. The stock generated millions of dollars of dividends each year. After J. Paul's death, all of the income from the 1934 trust was distributed to the income beneficiaries; however, Ronald received only $3,000 per year.

On June 1, 1979, Ronald, individually and as guardian ad litem for his children, filed suit in Los Angeles County Superior Court. The defendants named in Counts I and II of the complaint were the successor trustees and income beneficiaries of the 1934 trust. The defendants in Count III of the complaint were the trustees of the Museum.

In Count III of the complaint, Ronald sought to impose a constructive trust on the assets received by the Museum from J. Paul's estate and on all income derived therefrom in an amount equal to the amount of income received by each of J. Paul's other children (or their issue) from the 1934 trust for the period between J. Paul's death until the termination of the trust. Ronald alleged that J. Paul had promised Sarah that he "would provide in his Will for income to [Ronald] or his issue in an amount equal to that received by his other children and their issue from [the 1934 trust] following J. PAUL's death." Ronald further alleged that Sarah, in reliance on that promise, did not revoke the 1934 trust or make more generous provisions for Ronald in her will. The prayer for relief in Count III asked:

> That the Court declare that the trustees of the Museum are constructive trustees of the assets received and to be received from the estate of J. PAUL GETTY and all income derived therefrom in an amount equal to the amount of income received by or credited to each of J. PAUL's other children (or their issue by right of representation) from [the 1934 trust] since [the date of J. Paul's death] until the termination of [the 1934 trust].

The prayer further asked that the trustees of the Museum be ordered to pay Ronald or his issue "all sums of which said trustees have been declared to be constructive trustees."

Ronald did not seek to set aside J. Paul's will or assert a direct claim against the estate because (1) he believed an action against the Museum as the residuary beneficiary was the better form of action under California law, (2) he did not want to take a position adverse to that of the estate given his fiduciary obligations as a co-executor of J. Paul's will, and (3) he did not want to jeopardize his fee as co-executor.

In June 1980, the trustees of the Museum and Ronald entered into a settlement agreement. The settlement agreement provided that Ronald would dismiss Count III of the complaint with prejudice in exchange for the payment of $10 million. A

dismissal of Count III was filed with the Superior Court on July 10, 1980.

Ronald did not report the $10 million he received from the settlement as income on his 1980 income tax return. On audit, the Commissioner determined that the $10 million payment was includable as ordinary income. Accordingly, the Commissioner issued a notice of deficiency in the amount of $6,883,975 against Ronald for the tax year 1980.

Ronald filed suit in the tax court seeking redetermination of the deficiency. Ronald contended that the $10 million payment was excludable from gross income under Internal Revenue Code § 102(a), which excludes from gross income "the value of property acquired by gift, bequest, devise, or inheritance."

After a trial, the tax court issued its opinion rejecting Ronald's contention and sustaining the Commissioner's determination that the $10 million was includable in Ronald's 1980 income tax return as ordinary income. *See Getty v. Commissioner*, 91 T.C. 160 (1988). The tax court also rejected Ronald's alternative argument that the $10 million payment should be given capital gains treatment as the sale or exchange of a capital asset. A deficiency of $5,497,792 was assessed. Ronald appeals.

## DISCUSSION

We review the tax court's factual findings for clear error. *Moss v. Commissioner*, 831 F.2d 833, 837 (9th Cir.1987). We review de novo the tax court's decisions on questions of law. *Id.*

■ Section 61(a) of the Internal Revenue Code defines gross income as "all income from whatever source derived," subject to certain exclusions provided in the Code. 26 U.S.C. § 61(a). Accordingly, any funds or other accessions to wealth received by a taxpayer are presumed to be gross income and are includable as such in the taxpayer's return, unless the taxpayer can demonstrate that the funds or accessions fit into one of the specific exclusions created by the Code. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–31, 75 S.Ct. 473, 475–77, 99 L.Ed. 483 (1955).

On appeal, Ronald attempts to demonstrate that the $10 million he received from the trustees of the Museum fits into the exclusion provided by section 102(a) of the Code. That section excludes from gross income "the value of property acquired by gift, bequest, devise, or inheritance." However, section 102(b)(2) provides that the section 102(a) exclusion does not apply "where the gift, bequest, devise, or inheritance is of income from property." [4]

■ Ronald did not acquire the $10 million payment by gift, bequest, devise, or inheritance, but by settlement of a claim in a lawsuit. "[W]hether a claim is resolved through litigation or settlement, the nature of the underlying action determines the tax consequences of the resolution of the claim." *Tribune Publishing Co. v. United States*, 836 F.2d 1176, 1177 (9th Cir.1988). In characterizing the settlement payment for tax purposes, we ask, " 'In lieu of what were the damages awarded?' " *Id.* at 1178 (quoting *Raytheon Prod. Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir.), *cert. denied*, 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944)); *see also Spangler v. Commissioner*, 323 F.2d 913, 916 (9th Cir. 1963) (question was what the taxpayer would have received had sums wrongfully withheld been paid when due); *Victor E. Gidwitz Family Trust v. Commissioner*, 61 T.C. 664, 673–74 (1974) (question was what the taxpayer would have received in a merger had the consideration for the taxpayer's shares been adequate). Thus, we

---

**4.** Section 102 states in relevant part:
   (a) **General rule**
      Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.
   (b) **Income**
      Subsection (a) shall not exclude from gross income–
      (1) the income from any property referred to in subsection (a); or
      (2) where the gift, bequest, devise, or inheritance is of income from property, the amount of such income.
26 U.S.C. § 102.

engage in the fiction of treating the settlement proceeds received by Ronald as if they had been received from J. Paul in satisfaction of his alleged promise. *See Tribune Publishing Co. v. United States*, 836 F.2d at 1179.

■ The Commissioner argues that Ronald's claim was for income from property because in his complaint Ronald characterized the benefit he sought in enforcing J. Paul's promise to Sarah as a claim to income. In his complaint, Ronald alleged that J. Paul promised Sarah to provide in his will for "income" to Ronald in an amount equal to that received by J. Paul's other children from the 1934 trust following J. Paul's death. Treated as a bequest of income from property, the Commissioner argues, the settlement amount is not excluded from gross income. *See* 26 U.S.C. § 102(b)(2).

Although the language of the allegations a party includes in his complaint provides some evidence as to the nature of the party's claim, *see Inco Electroenergy Corp. v. Commissioner*, 54 T.C.M. (CCH) 359, 363 (1987), we employ a broad approach in determining the true nature and basis of a party's claim. *See Parker v. United States*, 573 F.2d 42, 49, 215 Ct.Cl. 773, *cert. denied*, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978); *Victor E. Gidwitz Family Trust v. Commissioner*, 61 T.C. at 674. Taking this approach, the language of the complaint, including that contained in the prayer, reasonably can be read as a claim by Ronald for a judicial declaration that the trustees of the Museum hold in constructive trust for him assets received from J. Paul's estate in an amount equal to the "amount of income received by or credited to each of J. Paul's other children"

from the 1934 trust from the death of J. Paul until the termination of the 1934 trust.[5] This reading of the language of Ronald's complaint is consistent with the evidence before the tax court and the tax court's findings.

In its opinion, the tax court found that, had J. Paul performed his promise to remedy the inequality, he "probably" would have done so by a bequest of property. This finding is supported by substantial evidence which includes the Hecht letters exchanged between J. Paul's attorney, the attorney for Getty Oil, and the attorney who represented J. Paul and Sarah. The finding is also supported by the terms of Sarah's will which followed the plan discussed in the Hecht letters for her to remedy the inequality to Ronald during J. Paul's lifetime, J. Paul's assurances to Fini and to Ronald that he would see to it that the inequality was remedied, and the provision in J. Paul's will by which some Getty Oil stock was left to Ronald, but not to any of the other children who received under the will only insignificant bequests. Moreover, the tax court was persuaded from all the evidence that Ronald, Fini, Ronald's attorneys, and the trustees of the Museum and their attorneys all believed that J. Paul had promised to provide for Ronald in his will to remedy the inequality, and that had he kept his promise he would have done so by a bequest of property, probably of Getty Oil stock.

■ Nevertheless, the tax court concluded that, because Ronald could not prove that J. Paul "necessarily" would have remedied the inequality with a bequest of property as opposed to a bequest of income,[6] he was not entitled to exclude the $10 million settlement payment from his

**5.** That the amount of the constructive trust Ronald sought to have declared was measured by the income J. Paul's other children would receive from the 1934 trust does not determine the true basis of the recovery sought. *See Farmers' & Merchants' Bank v. Commissioner*, 59 F.2d 912, 913 (6th Cir.1932); *Inco Electroenergy Corp. v. Commissioner*, 54 T.C.M. (CCH) at 363. Ronald did not seek income per se, but instead sought equalization with J. Paul's other children who were to receive income from the 1934 trust. The nature of Ronald's claim was a plea for

what J. Paul allegedly promised Sarah: that he would remedy the inequality by a provision for Ronald.

**6.** The Commissioner does not contend that J. Paul would have remedied the inequality outside of his will. At oral argument the Commissioner conceded that the $10 million payment should be treated as a bequest to Ronald. The Commissioner argues, however, that the bequest should be treated as a bequest of income, not of property.

gross income under section 102(a). The tax court agreed with the Commissioner's argument that, when characterizing proceeds from a settlement of litigation in a section 102 case, the proceeds must be "clearly classifiable" as either property or income from property.

We agree that the taxpayer bears the burden of establishing that proceeds of a settlement are what the taxpayer contends them to be, in this case property rather than income from property. We do not agree, however, that this imposes on the taxpayer a burden to prove that the proceeds are "clearly classifiable" in the way contended by the Commissioner.

■ When contesting a deficiency determination by the Commissioner, the burden of persuasion rests on the taxpayer. This burden requires the taxpayer to show the merits of his claim by at least a preponderance of the evidence. *Rockwell v. Commissioner,* 512 F.2d 882, 885 (9th Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). The tax court's factual conclusions indicate that Ronald has satisfied this burden. Even though Ronald did not show that, had J. Paul remedied the inequality he "necessarily" would have done so with a bequest of property, Ronald did show and the tax court found that J. Paul "probably" would have done so with a bequest of property. This is all that the burden of persuasion by a preponderance of the evidence requires in this case.[7]

Because we conclude that Ronald carried his burden of proof as to the merits of his claim, we hold that the $10 million settlement payment was excludable from Ronald's 1980 gross income.[8]

REVERSED.

---

**7.** In the tax court proceedings, the Commissioner cited *United States v. Stewart,* 311 U.S. 60, 71, 61 S.Ct. 102, 109, 85 L.Ed. 40 (1940), for the proposition that statutory exemptions are to be narrowly construed. However, there is no disagreement in this case as to the language or scope of the exclusion section 102(a) provides. The disagreement is as to the classification of the settlement payment as property or as income from property.

**8.** We need not reach Ronald's alternative arguments that the settlement payment is excludable from gross income as a gift, or that, if the settlement payment is included in gross income, it should be taxed as a capital gain rather than as ordinary income.