318 F.3d 924
 Sheldon R. MILENBACH; Phyllis Milenbach, et al.; Los Angeles Raiders, a California Limited Partnership, Allen Davis, Tax Matters Partner; Los Angeles Raiders, a California Limited Partnership, A.D. Football, Inc., Tax Matters Partner, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 97-70123.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2002.
 Filed February 6, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jerome B. Falk, Jr., Stuart S. Lipton, Douglas A. Winthrop, Clara J. Shin, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, A Professional Corporation, San Francisco, CA, for the petitioners-appellants.
 Kenneth W. Rosenberg, Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.
 Appeal from the United States Tax Court. T.C. Nos. 1571-93, 1572-93, 1573-93, 1574-93, 12129-94 and 28514-92.
 Before: TASHIMA, THOMAS, and PAEZ, Circuit Judges.
 TASHIMA, Circuit Judge.
 
 
 1
 The Commissioner of Internal Revenue determined deficiencies in Petitioners-Appellants Sheldon and Phyllis Milenbach's federal income taxes for the years 1980 through 1982. The Commissioner also issued notices of Final Partnership Administrative Adjustments determining adjustments to the income of the Los Angeles Raiders, a California Limited Partnership, for the years 1983 through 1989. Petitioners (collectively the "Raiders") appeal from the Tax Court decisions affirming the contested determinations. See Milenbach v. Comm'r, 106 T.C. 184, 1994 WL 891961 (1996).
 
 
 2
 The Raiders own a professional football team and belong to the National Football League (the "NFL"). Prior to 1980, the Raiders played their home games at the Oakland-Alameda County Coliseum (the "Oakland Coliseum"). The Raiders' lease of the Oakland Coliseum expired at the end of the 1979 NFL season. During 1979, the Raiders negotiated with the Los Angeles Memorial Coliseum Commission (the "LAMCC") to allow the Raiders to begin playing their home games in the Los Angeles Memorial Coliseum (the "LA Coliseum"). In 1980, the Raiders announced that they intended to leave Oakland and play their home games at the LA Coliseum. This announcement set in motion a series of events that resulted in enormous controversy for the team, including several lawsuits, and a number of business transactions whose tax consequences are at issue here. Specifically, the Raiders challenge the Tax Court's decisions regarding three discrete transactions related to the Raiders' relocation of their team. We analyze each in turn.
 
 I. THE LAMCC PAYMENTS
 A. Background
 
 3
 On March 1, 1980, the Raiders entered into a Memorandum of Agreement ("MOA") with the LAMCC providing for the relocation of the Raiders to Los Angeles beginning with the 1980 NFL season. The parties never implemented this MOA, however, because the City of Oakland ("Oakland") filed an action in eminent domain against the Raiders, seeking to condemn for public use the Raiders' NFL franchise, business, and physical assets. Both Oakland and the NFL obtained preliminary injunctions preventing the Raiders from relocating.
 
 
 4
 As a result, the Raiders played their 1980 and 1981 home games at the Oakland Coliseum. When the NFL injunction was lifted in 1982, the Raiders resumed negotiations with the LAMCC. On July 5, 1982, these negotiations produced a new Memorandum of Agreement (the "1982 MOA"). Pursuant to the 1982 MOA, in 1984, the parties executed a promissory note (the "Note") and a lease agreement for the LA Coliseum (the "Lease").
 
 
 5
 The 1982 MOA, the Note, and the Lease (collectively, the "LAMCC Agreement") provided that the LAMCC would loan the Raiders $6.7 million at 10 percent interest. The Raiders were to repay the loan from 12 percent of the net receipts from the operation of luxury suites to be constructed by the Raiders at the LA Coliseum. The repayment was to begin in the third year of suite rentals. The loan was secured by the to be-constructed suites, with no recourse to the Raiders. The loan consisted of a $4 million cash payment to the Raiders in 1984 and credits totaling $2.7 million against rent due from the Raiders for the years 1982 through 1986.
 
 
 6
 As to the construction of the suites, the 1982 MOA provided that the Raiders "shall construct" approximately 150 private suites. The MOA went on to state that the construction "shall commence as soon as practicable as determined by [the Raiders] in [their] reasonable discretion, having in mind pending and potential litigation involving the parties hereto, or either of them, financial considerations, and other considerations reasonably deemed important or significant to the [Raiders]." The Lease further provided that the Raiders "shall use [their] best efforts to begin and complete Suite construction as soon as possible." The LAMCC Agreement was the result of arm's-length bargaining between the Raiders and the LAMCC.
 
 
 7
 The Raiders began playing their home games at the LA Coliseum starting with the 1982 season. Plans to construct the suites prior to the 1984 Summer Olympics were abandoned after the Los Angeles Olympic Committee voiced concerns over the timing of the construction. The Raiders worked with architects and contractors on the planning of the suites throughout 1985 and 1986.
 
 
 8
 Actual construction began in early 1987, but was halted on February 18 of that year. On that date, the LAMCC demanded that suite construction stop because the Raiders had not obtained necessary performance bonds. The Raiders responded that they were willing and able to provide the required bonds, but stated that construction would cease because of the LAMCC's failure to make certain improvements to the LA Coliseum. Due to this dispute, construction never resumed and the suites were never completed.
 
 
 9
 The Raiders never made any payments on the LAMCC loan. In September 1987, the LAMCC filed a lawsuit claiming that the Raiders had breached the Lease by failing to construct the suites "as soon as practicable" and for failing to repay the $6.7 million loan. In January 1988, the Raiders answered the LAMCC's complaint, alleging that the LAMCC had breached a commitment to modernize and reconfigure the stadium. The lawsuit was settled on September 11, 1990.
 
 
 10
 In a Notice of Deficiency for 1982 and FPAAs for 1983 through 1986, the Commissioner disallowed the Raiders' rent deductions because the rent was not currently payable and was part of the loan from the LAMCC. In the alternative, if the rent deductions were allowed, the Commissioner determined that the amount of the rent credits were includable in gross income as advance payment of income. The Commissioner also determined that the $4 million advance paid in 1984 was includable in the Raiders' 1984 gross income.
 
 
 11
 The Tax Court held that the "loan" payments from the LAMCC were includable in the Raiders' income in the years in which they were received. Milenbach, 106 T.C. at 198. It held that the obligation to construct the suites was illusory and, therefore, the LAMCC payments did not qualify as loans for tax purposes because the Raiders "controlled whether or not repayment of the $6.7 million would be triggered." Id. at 196.
 
 B. Analysis
 
 12
 We review decisions of the Tax Court under the same standards as civil bench trials in the district court. Custom Chrome, Inc. v. Comm'r, 217 F.3d 1117, 1121(9th Cir.2000). Therefore, conclusions of law are reviewed de novo, and questions of fact are reviewed for clear error. Id. This court owes no special deference to the Tax Court's decisions on issues of state law. Harbor Bancorp & Subsidiaries v. Comm'r, 115 F.3d 722, 727 (9th Cir.1997). The interpretation and meaning of contract provisions are questions of law reviewed de novo. Kassbaum v. Steppenwolf Prods., Inc., 236 F.3d 487, 490 (9th Cir.2000).
 
 
 13
 A loan is generally not taxable income because the receipt of the loan is offset by the obligation to repay the loan. Comm'r v. Tufts, 461 U.S. 300, 307, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). For this rule to apply, however, the loan must be an "existing, unconditional, and legally enforceable obligation for the payment of a principal sum." Noguchi v. Comm'r, 992 F.2d 226, 227(9th Cir.1993); see also Geftman v. Comm'r, 154 F.3d 61, 68 (3d Cir.1998) (requiring "an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment") (citation and internal quotation marks omitted).
 
 
 14
 Whether a transaction is a loan for federal income tax purposes is ultimately a question of federal law. See Helvering v. Stuart, 317 U.S. 154, 162, 63 S.Ct. 140, 87 L.Ed. 154 (1942) ("Once rights are obtained by local law, whatever they may be called, these rights are subject to the federal definition of taxability."). Initially, however, state law determines the rights and obligations of the parties to a transaction. See id. at 161-62, 63 S.Ct. 140. But once an obligation is created by local law, it is subject to the federal definition of taxability. Id. Here, the dispositive question is whether the LAMCC Agreement was sufficient, under California law, to subject the Raiders to a non-illusory and enforceable obligation to repay the LAMCC advances. If the Raiders were subject to an "existing, unconditional, and legally enforceable obligation" to repay the LAMCC advances, the advances are properly treated as loans for federal income tax purposes. Noguchi, 992 F.2d at 227.
 
 
 15
 Contrary to the Tax Court's conclusion, the Raiders' broad discretion in the timing of the construction of the suites did not make the contract illusory. Under California law, an obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith. See Storek & Storek, Inc. v. Citicorp Real Estate, Inc., 100 Cal.App.4th 44, 122 Cal.Rptr.2d 267, 281 (2002) (holding that a promise to pay only if satisfied is not illusory if the ability to claim dissatisfaction is limited by the standard of reasonableness); 24 Hour Fitness, Inc. v. Superior Court, 66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533, 541 (1998) ("[W]here the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to prescribed or implied limitations such as the duty to exercise it in good faith and in accordance with fair dealings.") (citation and internal quotation marks omitted); Frankel v. Bd. of Dental Exam'rs, 46 Cal.App.4th 534, 54 Cal.Rptr.2d 128, 136 (1996) (holding that a contract is not illusory when the power to withdraw from the contract must be exercised in good faith).
 
 
 16
 Here, the Raiders were required to exercise their discretion reasonably and nothing in the LAMCC Agreement indicates that construction of the suites was optional. Both the 1982 MOA and the Lease state that the suites "shall be" constructed and both require the Raiders to use their "reasonable" discretion in deciding the exact timing in the construction of the suites. The Lease also required the Raiders to use their "best efforts" both to construct the suites as soon as possible and to operate them in such a way as to maximize the profits to be derived from them. At no point were the Raiders free to ignore their obligation to construct the suites. They could only delay the construction for a reasonable time and were required to use their best efforts to complete the suites and begin repayment of the loan. These limitations on the Raiders' discretion were sufficient to create a non-illusory obligation both to construct the suites and to repay the loan that would have been enforceable under California law. The fact that the obligations were later extinguished by the settlement of the 1987 lawsuit does not indicate that the obligation was illusory at the time the contract was made. Accordingly, we conclude that the Tax Court erred in holding that the LAMCC Agreement was illusory.
 
 
 17
 Because the Raiders had a non-illusory, unconditional obligation to repay the LAMCC loan, the payments were properly treated as loans and were excludable from income in the year in which they were received.[1]
 
 II. THE OAKLAND SETTLEMENT
 A. Background
 
 18
 The eminent domain suit filed by Oakland in 1980 was ultimately decided in favor of the Raiders. After it was decided that Oakland could not lawfully seize the Raiders' franchise, the Raiders sought damages arising from Oakland's condemnation action by filing a Notice of Claim for Damages in that proceeding. The Raiders sought recovery under the California and United States Constitutions, the common law, and California Code of Civil Procedure § 1268.620. Section 1268.620 allows the recovery of "all damages proximately caused by" a failed eminent domain action. Cal.Civ.Proc.Code § 1268.620(b). The Raiders claimed that Oakland had denied the Raiders "the free and untrammeled possession and use of the team." The Raiders claimed that they suffered damages from Oakland's failed condemnation action in the following ways: (1) they were compelled to maintain a summer training camp in Santa Rosa, California; (2) they were compelled to lease the Oakland Coliseum; (3) they were prevented from constructing the luxury suites in the LA Coliseum, and were thereby deprived of income from the sale and rental of those suites; (4) they suffered reduced attendance for home games played in the LA Coliseum; (5) they were deprived of income from radio contracts; and (6) they were forced to pay extra expenses for the relocation of personnel.
 
 
 19
 Oakland objected to the Claim for Damages on procedural grounds. To avoid these procedural objections, the Raiders, at the suggestion of the Superior Court, filed a complaint of inverse condemnation against Oakland for damages arising out of the eminent domain action. The Raiders reiterated their Claim for Damages, and stated that they had suffered damages in excess of $26 million. The Superior Court consolidated the two actions.
 
 
 20
 During discovery in the consolidated actions, the Raiders proffered a study detailing approximately $25 million in damages they claimed had been caused by Oakland's eminent domain action. Over $18 million of the damages claimed were attributed to lost income from suite rentals. Three million dollars were attributed to lost income from a contract with the Los Angeles Olympic Committee for use of the luxury suites, which the Raiders were prevented from constructing. The Raiders also claimed damages resulting from relocation and per diem expenses, lost radio income, lost attendance income, and lost food and beverage income.
 
 
 21
 In November 1988, the Raiders and Oakland settled the lawsuit. Oakland agreed to pay the Raiders $4 million in four yearly installments of $1 million plus interest. The settlement agreement stated that it was entered into for the "purpose of settling disputed claims involving the restoration of lost franchise value."
 
 
 22
 For each of the tax years 1988 and 1989, the Commissioner determined that settlement proceeds of $600,000 ($1 million less $400,000 attorney's fees) received by the Raiders constituted taxable income. The Tax Court found that the Oakland settlement represented recovery of lost profits and, therefore, constituted taxable income. Milenbach, 106 T.C. at 201.
 
 
 23
 The Raiders argue that no portion of the settlement represented recovery of lost profits. They assert that the settlement represented recovery of lost value to the franchise and therefore should be treated as non-taxable return of capital. The Raiders claim that they never sought to recover lost profits in their action against Oakland, only the lost value of their franchise. They argue that their Claim for Damages can only be read as seeking recovery for lost franchise value because they based their claim on Oakland's denial of "the free use and enjoyment" of their franchise. The Raiders also point to the fact that the settlement agreement with Oakland provided that the payment compensated the Raiders for "lost franchise value."
 
 B. Analysis
 
 24
 The nature of a settlement payment is a question of fact reviewed for clear error. See Langer v. Comm'r, 989 F.2d 294, 296 (8th Cir.1993) (per curiam); Wolfson v. Comm'r, 651 F.2d 1228, 1230 (6th Cir.1981); Spangler v. Comm'r, 323 F.2d 913, 916-17 (9th Cir.1963); Pac. Magnesium v. Westover, 183 F.2d 584, 584 (9th Cir.1950) (per curiam). When a claim is resolved by settlement, the relevant question for determining the tax treatment of a settlement award is: "In lieu of what were the damages awarded?" Getty v. Comm'r, 913 F.2d 1486, 1490 (9th Cir.1990); Raytheon Prod. Corp. v. Comm'r, 144 F.2d 110, 113 (1st Cir.1944). We take a "broad approach in determining the true nature and basis of a party's claim." Getty, 913 F.2d at 1491. If the payments are in lieu of lost profits, then they are taxable income. Shakertown Corp. v. Comm'r, 277 F.2d 625, 628 (6th Cir.1960); Raytheon, 144 F.2d at 113. If, however, the payments are for loss of franchise value due to damage to goodwill, then the payments are nontaxable return of capital. Raytheon, 144 F.2d at 113. The taxpayer bears the burden of establishing that proceeds of a settlement are what the taxpayer contends them to be. Getty, 913 F.2d at 1492.
 
 
 25
 The Tax Court did not clearly err in finding that some portion of the Oakland settlement represented recovery for lost profits. The Raiders' list of damages included several items that consisted entirely of lost profit. Nothing in the language of the Claim for Damages or the inverse condemnation complaint suggests that the Raiders intended to limit their recovery to the reduction in value of their franchise caused by loss of goodwill. In addition, almost every item listed in the damages report would have been taxable had it been received by the Raiders. Any settlement amount meant to replace this lost income would have been "in lieu" of taxable income and would itself be taxable. Getty, 913 F.2d at 1490.
 
 
 26
 The Raiders argue that it is inherent in the nature of an inverse condemnation action that their potential recovery is limited to the damage done to the value of their franchise, and that the lost income was mentioned only as a measure of that damage. We need not decide whether an award in an inverse condemnation action represents recovery only for damage to the property, however, because the Raiders' attempts to recover damages were not limited to an inverse condemnation action.
 
 
 27
 The Raiders also sought recovery under California Code of Civil Procedure section 1268.620. Although the Raiders later filed an inverse condemnation action, the Claim for Damages under section 1268.620 was not dismissed prior to the settlement. Section 1268.620 allows the property owner in an unsuccessful eminent domain action to recover "all damages proximately caused by the proceeding and its dismissal as to that property." Cal.Civ. Proc.Code § 1268.620(b). In Community Development Commission v. Shuffler, 198 Cal.App.3d 450, 243 Cal.Rptr. 719, 725 (1988), the California Court of Appeal noted how "broadly worded" the provision was and stated that the statute allowed recovery of all damages caused by the eminent domain proceeding. The Shuffler court went on to note that this statute did not limit any claim the defendant might have under inverse condemnation for damage to property during litigation. Id. An action under section 1268.620 is separate and distinct from an inverse condemnation action. Any limits on the types of damages a plaintiff can recover in an inverse condemnation action do not apply to property owners seeking to recover damages under section 1268.620.
 
 
 28
 The Raiders also contend that the language of the settlement agreement should be dispositive in determining the nature of the settlement payments. The settlement agreement stated that payments were meant to settle disputed claims "involving the restoration of lost franchise value." The Raiders claim that the Tax Court should not have looked beyond the language of the settlement agreement in the absence of collusion or bad faith.
 
 
 29
 Although the allocation set forth in a settlement agreement by the parties is one factor in determining the nature of a settlement payment, "[w]hen assessing the tax implications of a settlement agreement, courts should neither engage in speculation nor blind themselves to a settlement's realities." Bagley v. Comm'r, 121 F.3d 393, 395 (8th Cir.1997). A court should take a broad approach in determining the nature of a settlement payment and is not bound by any allocation made by the parties in their settlement agreement if there is evidence that the payment represented something else. See Bagley, 121 F.3d at 395; Delaney v. Comm'r, 99 F.3d 20, 23-24 (1st Cir.1996). This is especially true in a case, such as this one, where one party (Oakland) apparently had no interest in classifying damages one way or the other. Oakland had no motive to ensure that the allocation in the settlement agreement accurately represented the nature of the settlement payments.[2]
 
 
 30
 Given the broad recovery allowed under section 1268.620 and the nature of the damages that the Raiders claimed to have suffered, the Tax Court did not clearly err in determining that some portion of the Oakland settlement represented taxable lost profits. Because the Raiders did not meet their burden of providing some basis for allocating the settlement between taxable lost profits and non-taxable damage to franchise, the Tax Court correctly upheld the Commissioner's allocation of the entire amount to taxable lost profits.
 
 III. THE CITY OF IRWINDALE LOAN
 A. Background
 
 31
 The ongoing dispute between the Raiders and the LAMCC prompted the Raiders to enter into a Memorandum of Agreement (the "Irwindale MOA") with the City of Irwindale ("Irwindale") in August, 1987. The Irwindale MOA provided that the Raiders would construct a new stadium in Irwindale and play their home games in that stadium, starting in 1992, at the expiration of the Lease with the LAMCC. The Irwindale MOA also provided that Irwindale would loan the Raiders $115 million, to be repaid exclusively from revenue from the to-be-constructed stadium. The loan was to be secured by a deed of trust on the improvements the Raiders were obligated to build on the site provided for the proposed stadium.
 
 
 32
 Under the agreement, Irwindale advanced the Raiders $10 million of the loan. The Irwindale MOA provided that, should Irwindale fail to perform its obligations under the MOA, then all of the Raiders' obligations under the MOA would be extinguished, including the obligation to repay the advance. The Raiders would then be entitled to keep all funds advanced to them "as consideration for the execution" of the MOA. The MOA stated that Irwindale proposed to finance the project by issuing general obligation bonds.
 
 
 33
 The Irwindale MOA made allowances for some obstacles to the performance of the MOA:
 
 
 34
 8.5 If any obstacle is imposed by third parties (such as litigation, legislation, or failure to cooperate) it is agreed that both parties pledge good faith cooperation to overcome such obstacle. However, these obstacles will not be construed as a tolling event for the project itself, nor will it be construed as a reason to refund any exchange of monies, nor will it be construed as a forfeiture. It is further agreed, that both parties will move forward with the project and mutually work to resolving the problem ....
 
 
 35
 8.6 Any third party obstacle will not excuse either party from proceeding with the project except to the extent ordered by court, e.g. an injunction.
 
 
 36
 In September 1988, the California Legislature enacted a statute that prohibited Irwindale from using general obligation bonds to fund construction of a stadium that would be turned over to a private company, such as the Raiders. This new law made it impossible for Irwindale to finance the project in the way proposed in the Irwindale MOA.
 
 
 37
 Despite this obstacle, the Raiders continued to negotiate with Irwindale through 1990 in an attempt to reach an agreement that would allow construction of a stadium in Irwindale. All alternative financing schemes were rejected, however, and, by late December 1989, one of Irwindale's negotiators declared that the parties were back where they had started two years earlier. In early 1990, the Raiders sought further proposals from Irwindale, but none was ever produced. The Raiders were never required to repay the $10 million advance.
 
 
 38
 At trial, the Commissioner argued that the Irwindale advance was not a bona fide loan and that it was taxable income in 1987, the year it was received. In the alternative, the Commissioner argued that the debt had been discharged in either 1987, 1988, or 1989.
 
 
 39
 The Tax Court held that the Irwindale advance was properly treated as a loan, rejecting the Commissioner's argument that it should be treated as taxable income in the year in which it was received. Milenbach, 106 T.C. at 201-02. The court also rejected the Commissioner's contention that the Irwindale debt was discharged in 1987. Id. at 203. Instead, the court found that the debt had been discharged in 1988, and that the Raiders realized $10 million in taxable income as a result. Id. at 204. The court based this finding primarily on the passage of the law in September 1988 which made financing the stadium with general obligation bonds impossible.[3] Id. at 203-04. The court reasoned that because the 1988 legislation prohibited the use of general obligation bonds to fund the project as proposed in the MOA, negotiations that continued beyond 1988 "were not conducted under the Irwindale MOA." Id. at 203.
 
 B. Analysis
 
 40
 The Tax Court's determination of the timing of a discharge of indebtedness is reviewed for clear error. Friedman v. Comm'r, 216 F.3d 537, 542 (6th Cir.2000). Clear error exists only when the reviewing court is left with a "definite and firm conviction that a mistake has been committed." Gonzalez-Caballero v. Mena, 251 F.3d 789, 792 (9th Cir.2001) (citation omitted).
 
 
 41
 The discharge of a valid debt is treated as taxable income. 26 U.S.C. § 61(a)(12). A debt is discharged for tax purposes when "it becomes clear that the debt will never have to be paid." Friedman, 216 F.3d at 546. Determining the timing of a discharge of debt requires "a practical assessment of the facts and circumstances relating to the likelihood of payment." Id. Courts look at all of the facts concerning repayment, requiring only that the time of discharge be fixed by "some identifiable event which fixes the loss with certainty." Id. at 547-48. Repayment of the loan need not become absolutely impossible before a debt is considered discharged. Exch. Sec. Bank v. United States, 492 F.2d 1096, 1099(5th Cir.1974). A slim possibility that a debt may still be enforced does not prevent a debt from being treated as discharged for federal tax purposes. Id. at 1099-1100.
 
 
 42
 Although the test for discharge of debt requires the examination of the practical probability that a debt will be repaid, the Tax Court expressly based its holding that the Raiders debt was discharged in 1988 on its conclusion that passage of the 1988 legislation "prohibited the implementation of the Irwindale MOA." Milenbach, 106 T.C. at 203. It concluded that, under California law, the terms of the contract required Irwindale to fund the loan with general obligation bonds or forfeit the advance.
 
 
 43
 Under California law, the mutual intention of the parties at the time the contract is formed governs interpretation of the contract. Cal. Civ.Code § 1636; AIU Ins. Co. v. Superior Court, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1264 (1990). Such intent is to be inferred, if possible, solely from the written provisions of the contract. Cal. Civ.Code § 1639; AIU Ins. Co., 274 Cal.Rptr. 820, 799 P.2d at 1264. Forfeitures are not favored, however, and courts must strictly construe forfeiture provisions against the party on whose behalf they are invoked. Cal. Civ. Code § 1442; Deutsch v. Phillips Petroleum Co., 56 Cal.App.3d 586, 128 Cal.Rptr. 497, 501 (1976). Where there are two possible interpretations of a contract, one that leads to a forfeiture and one that avoids it, California law requires the adoption of the interpretation that avoids forfeiture, if at all possible. Ballard v. MacCallum, 15 Cal.2d 439, 101 P.2d 692, 695 (1940).
 
 
 44
 Here, the terms of the MOA can, and must, be interpreted to avoid a forfeiture based on Irwindale's inability to fund the stadium with general obligation bonds. The terms of the forfeiture provision state that the advance would be forfeited only if Irwindale was unable "to provide the full funding of the entire amount of the loan provided for in paragraph 4.7." Although paragraph 4.7 mentions passage of a general obligation bond as a triggering date for two of the payments, it does not require that the loan actually be funded from such bonds. While it is clear that the parties assumed that Irwindale would be funding the loan with these general obligation bonds, there is no indication that either party intended to require such funding. Rather, the MOA required the forfeiture of the advance only if Irwindale was unable to come up with the full amount of the loan. Forfeiture would occur only if Irwindale was unable to provide the funds, from whatever source. The MOA did not require forfeiture if financing by general obligation bonds became impossible, as long as Irwindale could provide the funds from some other source. The passage of the 1988 legislation was simply another obstacle that the parties to the MOA had agreed to attempt to overcome. Had alternate funding become available, the Raiders would have continued to be bound by the Irwindale MOA, provided that Irwindale met all of its other obligations. Thus, the Tax Court erred in holding that the MOA ceased to bind the parties after the passage of the 1988 legislation.
 
 
 45
 On remand, the Tax Court must determine whether the Irwindale debt was discharged in any of the challenged years. The court must perform a "practical assessment of the facts and circumstances relating to the likelihood of payment." Friedman, 216 F.3d at 546. The court must determine when, as a practical matter, it became clear that Irwindale would not be able to fund the entire loan and that the stadium would not be built. It was at that point that a forfeiture resulted and the Irwindale debt was discharged.[4]
 
 CONCLUSION
 
 46
 We affirm the Tax Court's decision that the Oakland settlement represented recovery of taxable lost profits. We reverse, however, the Tax Court's decision that the LAMCC loan payments were taxable upon receipt and that the Irwindale debt was discharged in 1988, and remand this case for further proceedings consistent with this opinion. Each party shall bear his, her, or its own costs on appeal.
 
 
 47
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Our holding may or may not end the inquiry with respect to the taxability of the LAMCC loan. Although the Raiders were obligated to repay the loan at the time the payment was received and the rental offsets were made, at some point in time since then, that obligation was extinguished. Such a discharge of indebtedness must be treated as taxable income in the year in which the discharge occurred. 26 U.S.C. § 61(a)(12). The record does not disclose when, if ever, the Raiders recognized the LAMCC loan proceeds as income. Presumably, the Commissioner can further challenge that timing decision, but that issue is not before us
 
 
 [2]
 In fact, it would be in Oakland's interest to allow the Raiders to claim that the payments represented non-taxable loss of franchise value, if doing so would achieve a reduction in the amount of the settlement
 
 
 [3]
 The Tax Court also noted that during litigation related to the Irwindale project both Irwindale and the Raiders stated that the Raiders was entitled to "keep the $10 million `regardless of what happen[ed].'"Milenbach, 106 T.C. at 203. It is not clear what weight, if any, the Tax Court gave to these statements. In the context of the lawsuit in which these statements were made, they indicated only that the Raiders would be entitled to keep the advance even if the state court prevented the Irwindale stadium from being built. The statements cannot be reasonably interpreted as an admission that the Raiders were not ever obligated to repay the advance. Such a reading would clearly conflict with the plain terms of the MOA. Nor can Irwindale's statement be reasonably read as releasing the Raiders from its obligation to repay the advance.
 
 
 [4]
 Although we have concluded that, as a matter of California law, the Tax Court erred in holding that the Irwindale MOArequired that the loan be funded with general obligation bonds, we express no opinion on the outcome on the merits of this issue, including how much weight the Tax Court should give to the passage of the 1988 legislation in its weighing of the factors as to when funding of the Irwindale stadium became a practical impossibility.