[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10810
_____

D.C. Docket No. 2:16-cv-00536-PAM-MRM


JOSEPH M. MCKENNY,
AMY F. MCKENNY,

Plaintiffs - Appellees/Cross-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant - Appellant/Cross-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 1, 2020)

Before JORDAN, GRANT, and SILER,* Circuit Judges.

JORDAN, Circuit Judge:

Joseph and Amy McKenny sued their accounting firm, alleging that its negligence led to them having to pay over $2 million in federal taxes to the government. The firm, while denying liability, settled the case by paying the McKennys $800,000.

Does that sum constitute taxable income to the McKennys? That question of first impression, and others, are before us in this tax appeal.

## I

Mr. McKenny worked as an independent consultant providing advisory services to car dealerships. In the late 1990s, he hired Grant Thornton, an accounting firm, to advise him on tax strategy and preparation.

Grant Thornton recommended that Mr. McKenny structure his consulting business as an S corporation for tax purposes. S corporations do not pay income taxes at the corporate level. Instead, an S corporation's income passes through to its owners. *See* 26 U.S.C. §§ 1362, 1366. Grant Thornton also recommended that the S corporation be wholly owned by an Employee Stock Ownership Plan (ESOP), whose sole beneficiary would be Mr. McKenny. ESOPs are tax-exempt employee

---

* The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

retirement plans, and an ESOP's beneficiaries are taxed on their contributions only when plan benefits are distributed. *See* 26 U.S.C. § 402(a).

The upshot of Grant Thornton's recommendation was that by combining an S corporation with an ESOP, Mr. McKenny would be able to defer taxation on the proceeds from his consulting business. The income earned by the business would pass through the S corporation without being subject to corporate income tax, and then accumulate tax-free in the ESOP until it made distributions to Mr. McKenny.

That, at least, was Mr. McKenny's understanding when he decided to implement Grant Thornton's recommended strategy. In 2000, he became the sole employee of an S corporation called Joseph M. McKenny, Inc., although the S corporation election was allegedly improperly filed with the IRS at Grant Thornton's direction. This S corporation would in turn be owned by the Joseph M. McKenny, Inc. ESOP (JMM ESOP), whose sole beneficiary was Mr. McKenny. The McKennys maintain that no ESOP was created or approved as required by the Tax Code because Grant Thornton failed to prepare or provide proper documents for the ESOP and the related trust and failed to take actions to ensure that the ESOP was properly formed and operated.[1]

---

[1] The McKennys contend that because the ESOP was never properly formed, it did not own Joseph M. McKenny, Inc. Nevertheless, it appears Mr. McKenny understood that Joseph M. McKenny, Inc. was owned by the JMM ESOP pursuant to the general structure of Grant Thornton's S/ESOP plan. In its response to the McKennys' motion for summary judgment, the IRS admitted that Grant Thornton filed an S corporation election for Joseph M. McKenny, Inc., but objected to the McKennys' assertions related to the ESOP's purportedly deficient formation, alleging that those

That same year, Mr. McKenny also acquired a 25 percent interest in a GMC car dealership in Florida. Based on Grant Thornton's advice, this 25 percent stake was formally held in a separate S corporation. And this other S corporation, like the consulting business, was in turn wholly owned by the JMM ESOP. For tax purposes, Grant Thornton advised the McKennys that the dealership's payments to the S corporation should be characterized as management fees rather than a share of profits.

Beginning in 2000, Mr. and Mrs. McKenny jointly filed tax returns that reflected the tax strategy devised by Grant Thornton. And for several years, they paid little or no federal income tax. But pursuant to a 2005 audit, the IRS determined that between 2000 and 2005 the McKennys had underpaid their federal income taxes. According to the audit, the McKennys' tax strategy as to the GMC car dealership was an unlawful and abusive tax shelter. The audit also identified unpaid liabilities as to the consulting business, although the record does not specify why the McKennys underpaid taxes as to that business.[2]

---

assertions were not supported by admissible evidence and were too general to support the contention that the S/ESOP strategy properly could have been effectuated. For purposes of this appeal, the parties' dispute on this issue is not material.

[2] As noted, the McKennys assert that due to Grant Thornton's negligence the ESOP was never properly formed, and that had it been correctly established, the tax strategy for the consulting business could have been lawful for at least some of the relevant period. The government does not dispute that, hypothetically speaking, the strategy could have been lawful until 2004. *See* Recording of Oral Argument at 2:30–3:05. But after 2004, the strategy was made unlawful by federal legislation. *See* 26 U.S.C. § 409(p); Econ. Growth & Tax Relief Reconciliation Act of

In 2007, the McKennys settled their unpaid liabilities with the IRS. In the settlement agreement—which we discuss in more detail later—they conceded all claimed tax benefits from the ESOP transactions, and acknowledged that they owed unpaid taxes as to both the consulting business and the stake in the car dealership. They committed to paying the full amount of the liabilities from the ESOP transactions, and ultimately paid the IRS $2,235,429 in income taxes, interest, and penalties.

Then, in 2008, the McKennys sued Grant Thornton in state court. They alleged in relevant part that the firm committed accounting malpractice and was therefore responsible for their unpaid tax liabilities between 2000 and 2005. The complaint alleged that Grant Thornton had failed to (a) submit the ESOP to the IRS for a determination letter; (b) advise the McKennys that annual and continuing contributions would have to be made to the ESOP in order to maintain its qualification on a going-forward basis; (c) provide the McKennys with instruction regarding the timely adoption and execution of the ESOP and related trust documents; (d) advise the McKennys regarding the requirement that the ESOP engage an independent appraiser to perform an annual appraisal; (e) advise the McKennys to maintain annual administrative records for the ESOP; (f) advise the

2001, Pub. L. No. 107-16, § 656 (2001). Congress passed the Reconciliation Act in 2001, but certain S/ESOPs could qualify for a phased-in effective date of December 31, 2004.

5

McKennys regarding the removal of the initial trustee; (g) advise  the McKennys regarding the non-discrimination testing requirements under the Tax Code; and (h) provide proper ESOP documents which satisfied the qualification requirements under the Tax Code.[3]

In 2009, Grant Thornton settled the suit by paying the McKennys $800,000. In the settlement agreement, however, Grant Thornton expressly denied the claims against it and all liability related to the tax advice it provided to the McKennys.

Over the following three years, the McKennys filed tax returns with several deductions and exclusions related to their lawsuit against Grant Thornton.  On their 2009 tax return, they (1) deducted $419,490 in legal fees they allegedly paid to litigate the malpractice claim; (2) claimed an unreimbursed loss representing the difference between the settlement payment they received from Grant Thornton and the settlement payment they made to the IRS; and (3) excluded the $800,000 settlement payment from their gross income.  Based on these deductions and exclusions, the McKennys claimed a net operating loss, which they carried forward to reduce their tax liability in 2010 and 2011.

---

[3] In addition to the accounting malpractice claim, the complaint asserted claims for breach of contract, breach of fiduciary duty, and violations of the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.*  The McKennys sought total damages in excess of $7.9 million, taking into account not just the roughly $2.2 million that they paid the IRS, but also the fact that this payment was made using after-tax dollars.

In September of 2013, the IRS issued a notice of deficiency rejecting all of these claimed deductions and exclusions. First, the IRS recharacterized the legal expenses as a miscellaneous itemized deduction rather than a business deduction, which meant that that the expenses were deductible only to the extent that they exceeded two percent of the McKennys' adjusted gross income. Second, the IRS disallowed the loss deduction. Third, the IRS denied the exclusion of the settlement payment. As a result of these and other IRS determinations, the McKennys had to pay an additional $813,407 in taxes.

The McKennys then filed a refund claim for that amount with the IRS. The IRS denied the refund as to the 2009 claim and did not respond to the 2011 claim before the McKennys filed this suit.[4]

In July of 2016, the McKennys sued the government, seeking a refund of about $586,000—the amount of the disallowed exclusions and deductions for 2009 and 2011. The parties filed cross-motions for summary judgment, and the district court granted in part and denied in part both motions.

The district court concluded that the legal expenses incurred in the Grant Thornton litigation were not deductible business expenses because the McKennys sued Grant Thornton on their own behalf, rather than on behalf of the consulting

---

[4] The government issued the McKennys a refund for the 2010 claim, but says it was issued by mistake. *See* Govt.'s Opening Br. at 17. Because that refund is not at issue in this appeal, we do not discuss it further.

business.  As to the purported unreimbursed loss, the district court ruled that the McKennys were barred by their 2007 settlement with the IRS from claiming any losses related to the ESOP transactions.  Finally, as to the exclusion of the $800,000 settlement payment, the district court agreed with the McKennys that the settlement was a return of capital and therefore excludable from gross income.  Each side, apparently unhappy with a partial victory, seeks complete vindication on appeal.

## II

We review the district court's summary judgment order *de novo*, viewing all the evidence and all reasonable inferences in favor of the non-moving party.  *See Squish La Fish, Inc. v. Thomco Specialty Prods., Inc.*, 149 F.3d 1288, 1290 (11th Cir. 1998).  Summary judgment is appropriate only where there is no genuine issue as to any material fact, such that judgment in favor of one party is appropriate as a matter of law.  *See* Fed. R. Civ. P. 56(a).

## III

On appeal, the McKennys argue that the district court erred in denying their deductions of their legal fees as a business expense and of their purported unreimbursed loss.  The government, in its cross-appeal, contends that the district court erred in concluding that the $800,000 Grant Thornton settlement was a return of capital rather than gross income.

8

We note at the outset that IRS determinations in a notice of deficiency are entitled to a presumption of correctness, and as a result the burden is on the taxpayer to prove by a preponderance of the evidence that they are incorrect. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933) ("[The IRS Commissioner's] ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong.") (citation omitted); *Carson v. United States*, 560 F.2d 693, 695–96 (5th Cir. 1977) ("The burden and the presumption, which are for the most part but the opposite sides of a single coin, combine to require the taxpayer always to prove by a preponderance of the evidence that the Commissioner's determination was erroneous. . . . This burden applies whether the proceeding is in Tax Court . . . or in district court upon a refund claim or a government counterclaim.") (citations omitted).  In a tax refund action filed in district court, like the one here, the taxpayer also has the burden of proving the amount he is entitled to recover. *See United States v. Janis*, 428 U.S. 433, 440–41 (1976) (citation omitted).  "[I]t is incumbent upon the claimant to show that the United States has money which belongs to him." *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932), *modified*, 284 U.S. 599 (1932) (citation and internal quotation marks omitted).

## A

We first address the McKennys' deduction of legal fees from the lawsuit against Grant Thornton as a business expense.  As noted, the IRS rejected the

McKennys' characterization of these legal costs as a business deduction, and recharacterized them as a miscellaneous itemized deduction. As a result, these expenses—combined with the McKennys' other miscellaneous deductions—were deductible only to the extent that they exceeded two percent of the McKennys' adjusted gross income. *See* 26 U.S.C. § 67.

The Tax Code allows deductions for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). Therefore, for an expense to be deductible under § 162(a), it "must be one that has a business origin." *United States v. Gilmore*, 372 U.S. 39, 45 (1963). Whether litigation costs are deductible as a business expense depends on whether the litigation is "business or personal"—the question is "whether . . . the claim arises in connection with the taxpayer's profit-seeking activities." *Id.* at 48 (internal quotation marks omitted).

The McKennys argue that their legal costs are deductible because their lawsuit against Grant Thornton was "related to" and "regarding" Mr. McKenny's business operations. *See* McKennys' Principal and Response Br. at 42, 44. Insofar as Grant Thornton's alleged malpractice concerned advice as to how to structure Mr. McKenny's business ventures, the lawsuit was at least indirectly related to those ventures. But it is not enough for a legal claim to be merely related to a business. *See Gilmore*, 372 U.S. at 51–52 (denying deduction for expenses in divorce

litigation, even though the taxpayer's controlling interests and management roles in three business corporations were at stake in the divorce). Rather, the determinative factor is "the *origin* and *character* of the claim with respect to which an expense was incurred." *Id.* at 49 (emphasis added).

We have previously addressed the deductibility of litigation expenses indirectly related to business considerations. *See In re Collins*, 26 F.3d 116 (11th Cir. 1994). In *Collins*, the taxpayer created a trust for the benefit of his children and later filed for bankruptcy. The taxpayer and the bankruptcy trustee engaged in litigation over the assets of that trust and ultimately reached a settlement. The taxpayer then deducted his legal costs as a business expense, and the IRS challenged the deduction. The district court concluded that the litigation costs were a deductible business expense because the taxpayer's business failings caused the bankruptcy, and the bankruptcy in turn led to the litigation. We reversed. *See id.* at 118. Under *Gilmore*, we explained, what matters is not whether business considerations were a cause—even the proximate cause—of the litigation; the inquiry concerns "the *character* of the claim and its *origin*, i.e., did it *arise in connection with* taxpayer's income-producing activities." *Id.* (emphasis in original). And because the legal expenses at issue concerned a family trust in which the taxpayer had no interest, we concluded that they were personal in origin and character. *See id.* at 119. *See also Jack's Maint. Contractors, Inc. v. Comm'r*, 703 F.2d 154, 157 (5th Cir. 1983)

11

(denying deduction for a corporation's payment of its sole shareholder's legal fees in a tax evasion case).

Here, too, the litigation between the McKennys and Grant Thornton was personal in its character and origin.  The lawsuit concerned the McKennys' personal tax liability, not the tax liability of any business; the complaint alleged that Grant Thornton breached an agreement with the McKennys, not Mr. McKenny's businesses; and the complaint alleged malpractice as to services provided to the McKennys, not the businesses.  In short, the lawsuit's essential contention was not that Grant Thornton failed to adequately support the businesses' income-producing activities, but rather that Grant Thornton failed to help the McKennys reduce their *personal* tax liability.  We therefore affirm the district court's grant of summary judgment to the government as to the litigation expenses.

**B**

Next, we consider the approximately $1.4 million deduction for a purported loss.  This amount represents the difference between the sum the McKennys paid to settle the IRS audit determinations and the amount they received from Grant Thornton to settle the malpractice suit.

The Tax Code authorizes the IRS to enter into written settlement agreements.  *See* 26 U.S.C. § 7121(a).  Significantly, these agreements are "final and conclusive" and are "not [to] be reopened as to the matters agreed upon."  26 U.S.C. § 7121(b).

12

As we have said, IRS closing agreements "are interpreted under general principles of contract law and are binding on the parties who enter into them." *Ellinger v. United States*, 470 F.3d 1325, 1336 (11th Cir. 2006) (citing *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996), and explaining that federal common law contract principles apply).

The settlement agreement committed the McKennys to pay taxes in the amount "attributable to the disallowance" of certain "Transaction(s)," including "whatever actions . . . were taken to attempt to establish an [ESOP] and a management S corporation." D.E. 44-2 at 62, 64. And it barred the McKennys from claiming "any other deductions and/or losses relating to the[se] Transaction(s)." *Id.* at 63.

On appeal, the McKennys argue that their $1.4 million claimed loss was not related to those transactions, but rather was due to Grant Thornton's "failure to fully reimburse" them in the lawsuit. *See* McKennys' Principal and Response Br. at 51–52 (emphasis omitted). But this is a distinction without a difference. The McKennys do not—and cannot—dispute that their $2.2 million tax payment to the IRS was related to the ESOP transactions. Indeed, the payment was made to settle the tax liability resulting from those transactions. The settlement therefore bars the McKennys from claiming any deduction based on this payment.

13

It does not matter that the McKennys blame Grant Thornton for their tax troubles, or that they claim they were only partially compensated for Grant Thornton's alleged malpractice. Just as the settlement agreement would bar the McKennys from deducting the whole $2.2 million payment, it also bars them from deducting any fraction of that settlement for the covered transactions. Accordingly, we affirm the district court's grant of summary judgment to the government as to the $1.4 million deduction.

## C

Finally, we analyze the McKennys' exclusion of the $800,000 Grant Thornton settlement from their gross income. In a refund suit like this one, the McKennys have the burden of proving both their entitlement to the exclusion and the amount of that exclusion by a preponderance of the evidence. *See Janis*, 428 U.S. at 440–41; *Carson*, 560 F.2d at 695–96; *Estate of Herrmann v. Comm'r*, 235 F.2d 440, 444 (5th Cir. 1956).

## 1

The Tax Code defines "gross income" broadly, as "all income from whatever source derived." 26 U.S.C. § 61. When a taxpayer's claim is resolved by a settlement, whether the settlement constitutes taxable income depends on the answer to the following question: "In lieu of what were the damages awarded?" *See, e.g., Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728 F.3d 139, 144 (2d Cir. 2013);

*Milenbach v. Comm'r*, 318 F.3d 924, 932 (9th Cir. 2003); *Raytheon Prods. Corp. v. Comm'r*, 144 F.2d 110, 113 (1st Cir. 1944).

The McKennys rely on a Tax Court decision holding that gross income does not include a payment made as compensation for damages or loss that was caused by a third party's negligence in the preparation of a tax return. *See Clark v. Comm'r*, 40 B.T.A. 333, 335 (1939) (agreeing with the taxpayers that a payment received from their negligent tax counsel "constituted compensation for damages or loss caused by the error of tax counsel," and holding that "the amount received by [the taxpayers] in the taxable year, by way of recompense, is not then includable in [the taxpayers'] gross income"). The IRS acquiesced in the *Clark* ruling, *see* IRS Rev. Rul. 57-47, 1957-1 C.B. 23, 1957 WL 11946, at *2 (1957), and *Clark* has been followed by a couple of Tax Court decisions. *See Cosentino v. Comm'r*, T.C. Memo. 2014-186, 2014 WL 4473867, at *11 (2014); *Concord Instruments v. Comm'r*, T.C. Memo. 1994-248, 1994 WL 232364, at *24–25 (1994).[5]

---

[5] The IRS can acquiesce or announce whether it intends to follow the holding of a lower court in a document known as an Action on Decision. *See* Internal Revenue Manual § 4.10.7.2.9.8.1. An Action on Decision can provide guidance to IRS personnel working with the same or similar issues, but it is not intended to serve as public guidance and may not be cited as precedent. *See id.* Although acquiescence may indicate a party's likelihood of obtaining a favorable ruling on a similar point, it does not necessarily constitute the IRS' acceptance of any and all reasons supporting a ruling; it merely signals acceptance by the IRS of the conclusion reached and the application of law to the facts in that particular case. *See id. See also Power Equip. Co. v. United States*, 748 F.2d 1130, 1134 (6th Cir. 1984); *Quinn v. Comm'r*, 524 F.2d 617, 621 (7th Cir. 1975).

As the McKennys see things, the Grant Thornton settlement is not taxable.  It constitutes a return of their capital—capital which they lost due to Grant Thornton's accounting malpractice.  *See generally* Robert W. Wood, *Tax Treatment of Business Litigation Recoveries—Capital Gain vs. Ordinary Income*, 99 J. Tax'n 27, 28 (2003) ("Where a recovery compensates a plaintiff for injuries to a capital asset, the recovery constitutes a tax-free return of capital to the extent of the taxpayer's basis in the injured asset.").

The government asserts that *Clark* is distinguishable.  It relies principally on *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929), which holds that a third party's payment of a taxpayer's tax liability is generally included in gross income, regardless of the form of that payment.  *See id.* at 729 ("The discharge by a third person of [a taxpayer's tax] obligation . . . is equivalent to receipt by the [taxpayer].").  It also argues that *Clark* is limited to situations in which an accountant makes a mistake in preparing a tax return or in advising the taxpayer on how to prepare the return.  *Clark*, says the government, does not apply to settlements based on claims that an accountant committed malpractice in giving advice about, structuring, or implementing a transaction.  In the government's view, the Grant Thornton settlement involved the latter scenario and was essentially a payment to the McKennys of a portion of their tax liability.

16

Was *Clark* correctly decided?  And if it was, does it apply where, as here, the accountant's malpractice concerns not the preparation of the taxpayer's return but rather negligent advice or implementation concerning an underlying transaction? These are very difficult questions.

The IRS has sought, in later private letter rulings, to limit *Clark*.  In the late 1990s, for example, the IRS concluded that *Clark* does not apply where an accountant commits malpractice or negligence with respect to the advice for, or implementation of, an underlying economic transaction that results in additional tax liability.  If the accountant (or an insurance company on behalf of the accountant) in such a case reimburses or indemnifies the taxpayer for the additional taxes paid due to malpractice or negligence, that sum constitutes taxable income to the taxpayer. *See* IRS Private Letter Ruling 9728052, 1997 WL 382022 (July 11, 1997); IRS Private Letter Ruling 9743035, 1997 WL 660719 (Oct. 24, 1997); IRS Private Letter Ruling 9743034, 1997 WL 660718 (Oct. 24, 1997); IRS Private Letter Ruling 9833007, 1998 WL 473910 (Aug. 14, 1998).  For essentially the same reason, the IRS has disagreed with *Cosentino* and declined to acquiesce in that decision.  *See* IRS Action on Decision: *Cosentino v. Commissioner*, AOD-2016-1, 2017 WL 3080769 (April 18, 2016).  *See also* IRS Chief Counsel Advisory 201306018, 2013 WL 474551 (Feb. 8, 2013) (concluding that where the accounting malpractice is "an alleged failure to provide accounting and tax advice that may have reduced" the

17

taxpayers' federal tax liability, a payment of damages by the accountant "does not constitute a non-taxable return of capital" and must be included in the taxpayer's gross income).[6]

The Court of Claims has discussed *Clark* in several decisions. *See, e.g., Local Okla. Bank, N.A. v. United States*, 59 Fed. Cl. 713, 720–21 (Ct. Cl. 2004); *Centex Corp. v. United States*, 55 Fed. Cl. 381, 389 (Ct. Cl. 2003). Remarkably, however, aside from the decision of the district court below, no Article III federal court has addressed or applied *Clark* in the 80 years it has been on the books. And the literature on *Clark*, though generally supportive of its holding, raises a number of complex questions of tax law (including issues about the equal treatment of taxpayers and questions about tax policy). *See, e.g.,* Lawrence Zelenak, *The Taxation of Tax Indemnity Payments: Recovery of Capital and the Contours of Gross Income*, 46 Tax. L. Rev. 381, 385–402 (1991); Jeffrey Kahn, *The Mirage of Equivalence and the Ethereal Principles of Parallelism and Horizontal Equity*, 57 Hastings L.J. 645, 665–76 (2006).

We need not decide these difficult questions. Assuming that *Clark* was correctly decided, and that its rationale applies in a case like this one where the

---

[6] Private letter rulings do not have the force of law and are not binding. *See* 26 U.S.C. § 6110(k)(3). Nevertheless, they may constitute "persuasive authority" because they represent the views of the IRS, which is charged with administering the Tax Code. *See Davis v. Comm'r*, 716 F.3d 560, 569 n.26 (11th Cir. 2013).

accounting malpractice related not to the preparation of a tax return but to the structuring of an underlying transaction, the McKennys did not sustain their burden of demonstrating that the $800,000 settlement was excludable.

**2**

In the district court, the government argued that it was entitled to summary judgment because the McKennys could not establish the factual predicate of their argument as to exclusion of the $800,000 settlement. The government maintained that their "claimed harm [wa]s entirely speculative" and nothing in the record showed that they "would . . . have been entitled to the ESOP or its tax benefits." D.E. 44 at 13. The government pointed out that the McKennys "ha[d] designated no expert witness who could testify as to the [fact that they would have received tax benefits had Grant Thornton performed differently], and offered no admissible evidence or credible means that they could prove that they were uniquely entitled to the benefits of the [ESOP] tax shelter." *Id.* at 14.

The district court rejected the government's argument, explaining that the ESOP strategy was legal at the time that Grant Thornton proposed it to the McKennys. The court reasoned that the government "offered no legal authority for its argument that it might have denied approval for the ESOP strategy [Grant Thornton] proposed, and given that the tax laws expressly contemplated similar strategies, the [government's] contentions are not well taken. The McKennys' harm

19

is a fixed amount: the excess taxes, interest, penalties, and fees they had to pay because [Grant Thornton] did not properly follow through with the ESOP strategy." D.E. 63 at 5.

On appeal, the government again argues that the McKennys failed to carry their burden with respect to $800,000, and that the district court erred by assuming critical facts in their favor. *See* Govt.'s Opening Br. at 58–59 ("The McKennys did not meet [their] burden. They listed a number of steps that [Grant Thornton] allegedly failed to take that they maintain would have lowered their tax liability by the precise amount they were required to pay the IRS. There were numerous factual and legal assumptions baked into that contention, which the [g]overnment disputed and the McKennys did not prove, yet the [d]istrict [c]ourt accepted them as true in granting summary judgment to [the McKennys]. Not even *Cosentino* went that far.") (footnote omitted). The government points out, for example, that the district court assumed that Grant Thornton did not properly file the documents necessary to register the company as an S corporation, but the IRS exam report, which the McKennys themselves submitted at summary judgment, showed that the S corporation elections were filed and accepted by the IRS. *See id.* at 58 n.19 (citing D.E. 49, Ex. 6).

We think the government is correct. The general legality of the S/ESOP strategy at the time (through the end of 2004) is, by itself, insufficient for the

20

McKennys to satisfy their burden.  There is no strict rule for what taxpayers must do to establish their entitlement to an exclusion or to establish its amount.  But given the burden on taxpayers to prove their refund claim by a preponderance of the evidence, it is not enough for the McKennys simply to make a bald assertion, devoid of specifics, that they overpaid taxes or would not have incurred any federal taxes (or penalties) had Grant Thornton followed through on the S/ESOP strategy.  We cannot assume that the McKennys did not earn income from sources other than the consulting business and the interest in the car dealership.  There may have been revenue from savings accounts, the sale and purchase of securities, and/or real property transactions.  *See Carson*, 560 F.2d at 698–700 (holding that oral testimony by a taxpayer, coupled only with another piece of unreliable evidence, was not sufficient to carry his burden of showing error in one of the challenged tax assessments).

Furthermore, the S/ESOP strategy was disallowed as of December 31, 2004, and therefore could not have provided the McKennys with any tax benefits (or at least not the same tax benefits) in tax year 2005.  The McKennys offered nothing below on this point, and they fail to address it on appeal, except to suggest without further explanation (or citation to evidence) that the ESOP could have remained a tax-exempt pension plan after 2004, though they then would have had to convert Joseph M. McKenny, Inc. to a C corporation for 2005 and beyond.  *See* D.E. 42 at

21

13; McKennys' Principal and Response Br. at 30 n.8. That unsupported assertion—which assumes further tax-related efforts and does not explain the tax consequences of those efforts—is insufficient.

In *Herrmann*, the taxpayers petitioned for review of a decision by the Tax Court, which had sustained the Commissioner's findings that transfers in trust were gifts of future interest and that there were tax deficiencies resulting from the related exclusions from income. *See* 235 F.2d at 444. The former Fifth Circuit ultimately determined that the exclusions should be denied because the taxpayers had not met their burden of showing the amount of the exclusions as well as their right to the exclusions. *See id.* at 444–45. As the Fifth Circuit explained, there was no basis or formula to establish the value of future interests based on the features of the trust, and the taxpayers were therefore unable to show the value of the exclusions. *See id.* This case, we believe, calls for a similar result.

In their summary judgment motion, the McKennys said that "if [Grant Thornton] had properly performed its obligations, neither [Mr. McKenny], the S Corporation, . . . nor the ESOP would have incurred any [f]ederal income tax on the S Corporation's taxable income." D.E. 42 at 12. This statement, however, did not entitle the McKennys to summary judgment on their refund claim or create an issue of material fact. First, as noted, the government challenged this assertion and pointed out that it was not supported by any admissible or probative evidence.

Second, absent a stipulation or agreement, unsupported factual statements in a memorandum of law do not constitute evidence under Rule 56. *See, e.g., United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (explaining that, for purposes of summary judgment, "an attorney's unsworn argument [in court submissions] does not constitute evidence"); *Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991) ("Factual statements contained in defendants' brief attributable to counsel . . . do not constitute summary judgment evidence[.]").

Mr. McKenny submitted his own declaration, but it too was insufficient. Although a taxpayer's self-serving and non-conclusory affidavit can create an issue of fact, *see United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc), Mr. McKenny's declaration said nothing about whether Grant Thornton's advised S/ESOP strategy would have actually resulted in the McKennys paying no federal taxes had it been properly implemented. *See* D.E. 42-1 at ¶¶ 8–24. That is understandable, for at his deposition Mr. McKenny was unable to explain how the S/ESOP structure worked. *See* D.E. 44-2 at 12 ("Q: . . . Can you describe how the S Corp ESOP structure worked? A: I'm not an expert in that area. From a layman's perspective, I don't even know if I want to try to attack it because I think the ESOP area is so unique, I don't feel like I'm qualified to answer that. Q: . . . [W]hat was presented to you as the benefits of the structure? A: Primarily as a retirement vehicle.").

The record includes an interrogatory response from the McKennys with respect to the amounts they claim they would have paid in taxes had Grant Thornton properly implemented the S/ESOP strategy. *See* D.E. 44-4 at 3. Although the McKennys did not rely on this interrogatory response in their summary judgment briefing, and have not cited it in their appellate briefs, we have reviewed it to see if it might support the district court's ruling or create an issue of a material fact. The interrogatory response, however, does not change our view.

Other circuits have explained that a sworn interrogatory response is treated like an affidavit on summary judgment. *See, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49–50 (1st Cir. 1990). And we have held that conclusory affidavits lack probative value. *See, e.g., Evers v. General Motors Corp.*, 770 F.2d 984, 986–87 (11th Cir. 1985). The interrogatory response is conclusory, as it contains no explanation or details as to how the McKennys arrived at their respective tax liability numbers for the years in question. Even if the interrogatory response had some probative value, it contradicted the McKennys' claim in their summary judgment motion that *no* taxes would have been due had Grant Thornton implemented the S/ESOP strategy. For example, the interrogatory response states that the McKennys would have paid $2,932 in taxes for 2003, $3 in 2004, and $91,902 in 2005.

In short, aside from claiming that the ESOP strategy would have automatically resulted in no taxes in the years at issue, the McKennys did not present any evidence

concerning how the strategy would have actually operated on the ground. They did not submit anything about Mr. McKenny's consulting business (or its revenues) in the relevant years, or about how the ESOP would have been structured, or about what tax benefits the strategy would have provided, or about how Mr. McKenny's interest in the car dealership would have affected (or not affected) the strategy. And they did not offer the testimony of a tax expert with regard to how the S/ESOP strategy would have played out had Grant Thornton implemented it.[7]

On this record, the McKennys did not meet their twin burdens of showing their entitlement to the exclusion and the amount of that exclusion. The IRS' tax deficiency notice was presumed correct, and the McKennys did not overcome that presumption. *See Welch*, 290 U.S. at 115. The government was therefore entitled to summary judgment with regard to the $800,000 Grant Thornton settlement.

## IV

We affirm the district court's summary judgment in favor of the government as to the litigation expenses and the $1.4 million deduction. With respect to the $800,000 exclusion, we reverse the district court's grant of summary judgment in

---

[7] We do not suggest that taxpayers must employ an expert in a refund case like this one in order to prevail or to defeat summary judgment. We merely point out that the McKennys, having provided no evidence of their own concerning how the S/ESOP strategy would have worked in their favor, also failed to present the testimony of an expert who could have filled in the evidentiary gap.

25

favor of the McKennys, and remand for entry of judgment in favor of the government.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**